**STATE of Minnesota, Respondent,**

v.

**Larry Jerome FLOURNOY, Appellant.**

**No. C0–94–316.**

Supreme Court of Minnesota.

Aug. 4, 1995.

---

John M. Stuart, State Public Defender, Leslie J. Rosenberg, Sp. Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., Paul R. Scoggin, Asst. County Atty., Minneapolis, for respondent.

## OPINION

STRINGER, Justice.

Following a jury trial, defendant Larry Jerome Flournoy was convicted of first-degree murder and sentenced to a term of life imprisonment. Defendant appeals from the judgment of conviction. On appeal to this court, defendant argues: (1) that the trial court erroneously refused to instruct the jury that a juvenile witness who testified about the murder was an accomplice whose testimony must be corroborated; (2) that the evidence presented at trial was insufficient as a matter of law to support the conviction; and (3) that it was reversible error, in violation of defendant's right to a fair trial, for the trial court to impanel an anonymous jury. We affirm defendant's conviction.

On October 9, 1992, at around 10:45 p.m., the Minneapolis police received a call reporting gunshots in the alley behind 3333 Clinton Avenue South, in Minneapolis. Upon arrival, police discovered the body of Edward Harris, face down, with his hands above his head and with multiple gunshot wounds. An autopsy later determined that the body sustained

multiple injuries, including one wound to the back of the head, two wounds to the right arm, one wound to the left shoulder, and three wounds to the left arm. The shot to the back of the head was the fatal wound.

At approximately 2:00 a.m. on October 10, 1992, the police went to Harris' house and informed his wife that Harris had been killed. Loverine Harris became hysterical upon hearing the news and refused to talk with police. About 4:30 a.m. however, after the police returned to the station, they received a call from Loverine Harris. She informed them that she "had a lot to say," she feared for the safety of her children, and she wanted to ensure that they would be safe and protected. Later that day, Loverine Harris informed police that she believed her husband's murder was related to the murder of Minneapolis police officer Jerry Haaf, which occurred on September 25, 1992, approximately two weeks earlier.

At trial, Loverine Harris testified that her husband, Ed Harris, was a member of the Vice Lords, and that their duplex, located approximately one block away from the Pizza Shack, was a place where the Vice Lords regularly gathered to drink beer, watch television, and socialize. She testified that in the early morning hours on September 25, 1992, Mwati "Pepi" McKenzie and Shannon Bowles arrived at the Harris' apartment and told Ed Harris that they had just shot a man and wanted to change their clothes, hide the guns, and clean up. Harris provided them with a change of shirt and shoes and placed the guns in a bag that he hid in his attic.

Loverine Harris further testified that shortly thereafter, a 15–year–old juvenile named Richard arrived at the Harris residence and asked McKenzie and Bowles what had happened since he was supposed to have picked them up at the Pizza Shack after the shooting. She further testified that on that same morning police arrived at the Harris home and with the Harris' consent searched the duplex but the police did not check the attic where the guns were hidden. Later that day, when Loverine Harris learned from news accounts that a police officer had been killed, she informed her husband that she wanted the guns out of her home. Later

that evening, according to Loverine Harris, defendant appeared at the Harris home while she was sitting outside, and asked for the keys to her house in order to "move those things." She complied, and shortly thereafter defendant emerged carrying the bag that she had seen her husband place the guns in the night before.

Sergeant Jackson testified that in the days following the Haaf murder, police questioned Ed Harris on two different occasions regarding the homicide. Loverine Harris testified that a number of people saw Ed Harris leave in the company of the police, which prompted Vice Lord Ernest Parker to accuse Ed Harris of "snitching" to the police, but Ed Harris insisted he had not given the police information.

Loverine Harris testified that on October 9, 1992, the evening of Harris' murder, the Vice Lords had a meeting. Ed Harris was aware of the possibility of being disciplined for not attending, but he was reluctant to attend, in part because he was concerned that the police might show up at the meeting. Prior to the meeting, a number of Vice Lords came to Harris' house and asked if he was going, but he told the members he could not because his wife was at work and he had to baby-sit his kids. Loverine Harris testified that in reality she was hiding in the bedroom.

Lee Rockymore, a Vice Lord, attended the meeting that night and testified that after the meeting he overheard Vice Lords A.C. Ford, Steve Banks, Ernest Parker, and defendant, talk about Ed being "shut down" because he was "snitching." Shortly thereafter, a group of Vice Lords, including Steve Banks, Richard, Rockymore, and defendant, went to the Harris home. On their way, defendant told Rockymore that he was going to "shut him down," referring to Harris, and showed him a handgun he had with him.

Loverine Harris testified that after defendant and Rockymore arrived at the Harris home, she overheard defendant tell Harris that he would be disciplined for missing the meeting. Loverine Harris further testified that at some point defendant asked Harris to take him on a "marijuana run." As Harris was preparing to leave, defendant and Rock-

ymore joked about how they were going to "hurt somebody." Richard testified that he was under the impression that they were going to fight with a rival gang member named "Matt." Harris commented that he had not had a good fight in a long time.

Rockymore testified that the group, consisting of defendant, Rockymore, Harris, Richard, and Steve Banks, all left the Harris home in two cars with Harris, defendant, and Richard in Harris' car, and Banks and Rockymore in Banks' car. After driving for a short while, Banks signaled Harris to stop so Rockymore could join them in Harris' car. Rockymore told the others that Banks had someplace to go and defendant commented that Banks "knows where to go." Defendant then directed Harris to park in the alley behind 3333 Clinton Avenue. Harris complied. As all of the men got out of the car and began to walk into the alley, Rockymore, who knew that defendant was about to shoot Harris, turned to Richard and told him to run. Defendant then came up behind Harris and from about arms-length shot approximately six bullets into Harris.[1] Once the firing stopped, the two followed defendant as they ran from the scene.

Rockymore, defendant, and Richard ended up in an alley behind a house where Banks was waiting for them in his car. Rockymore testified that Banks did not seem surprised that Harris was not with them. Defendant told Rockymore, Richard, and Banks to tell others that they "got shot at by some gangsters," meaning a rival gang. Rockymore and Richard were instructed by defendant to go back to the Harris house, out of breath, acting as if they had been running, and defendant threatened that if they refused they would meet Harris' fate.[2]

Richard testified to essentially the same facts: that after defendant directed Harris to the alley and they all got out of the car, Richard noticed that defendant and Rocky-

more were whispering to each other. Then, as they began to walk into the alley, Rockymore came over to Richard and told him "when I run, you better run too." Richard testified that defendant came up behind Harris and shot him in the back of the head. After the first shot, Harris fell to his knees, then forward onto the ground. Richard believed he heard five to six shots and, after the shooting stopped, they all ran until they reached defendant's house where Banks was waiting for them. Defendant explained that Harris was killed because he was "snitching" and he told Richard, "Don't be next." Rockymore and Richard were instructed to say they had gone to buy some "weed" and "got into it with some gangsters" and they began to run, but Harris was "big, and he couldn't run that fast, and got caught." Banks then dropped defendant and Richard off at one street corner and Rockymore at another.

Defendant and Richard then went to the Harris home, and Loverine Harris testified that defendant told her that they had gone to purchase "weed," an argument broke out, someone shot into the air, and everyone had run off, but Harris had still not returned. Loverine Harris told them to find her husband. She also testified that she noticed that defendant appeared calm, while Richard appeared surprised and in shock. After defendant and Richard left, Loverine Harris went to Curleys, a nearby restaurant often frequented by Vice Lords. When she arrived, she saw defendant and other Vice Lords sitting in the restaurant. She testified that she was surprised to see them there since defendant had told her they were going to look for her husband. Later that evening, Loverine Harris was informed of her husband's death.

Ayieko Littemi, defendant's girlfriend, testified that she obtained a handgun from Terry Brussie about one week before the murder.[3] She claims that she let defendant use

---

1. Numerous area neighbors testified to hearing the sound of six to seven continuous gunshots.

2. Rockymore admitted in cross-examination testimony that he never informed the police in his statement that he had been threatened or that he would be killed if he told the truth about the Harris shooting.

3. Sergeant Rorvick testified that Brussie denied ever giving Littemi a gun, but records indicate that Brussie's brother was convicted for a gun shop burglary, in which a gun was stolen matching Littemi's description of the gun given to her by Brussie.

the gun and he had possession of it on the night Harris was murdered. Littemi was also at the Harris home after the meeting the night Harris was killed and recalls that at some point in the evening defendant whispered to her that "Ed's got to go." The day after Harris' murder, defendant confessed to Littemi that he, Rockymore, Richard, and Harris drove to an alley and when they got out of the car, he walked behind Harris and shot him in the back of the head. Littemi testified that defendant explained to her that he had seen Harris being picked up by the police and he thought Ed had been "snitching." When defendant returned the gun to her,[4] Littemi noticed that the bullets in the gun were Remington .380 hollow-point bullets. The ballistic experts determined that the expended bullet casings found at the murder scene were from a Remington .380.

Defendant, testifying in his own defense, admitted that he was a member of the Vice Lords and that he has specific responsibilities as a "five star elite minister of justice" requiring him to teach the younger members about religious beliefs and prayers. Defendant claims he held no enforcement powers and did not punish members. Defendant testified that he did not have a gun the day Harris was murdered, nor did he see anyone with a gun. He acknowledges being at Harris' home after the meeting and leaving with the other men, but claims that when the others left, he walked over to visit his daughter who lived a few blocks away from the Harris home. Defendant claims to have stayed at his daughter's for approximately two hours, then headed toward Curleys restaurant. It was then that Richard ran up to him and told him that they had been shot at and that Harris had not made it back. In an effort to calm Richard down, defendant claims he accompanied him to Harris' home to check if Harris had returned. Once at the Harris home, defendant related to Loverine Harris what Richard had told him about the shooting, and told her that he would look for Harris as soon as someone with a car came by. Defendant alleges he then went to Curleys to wait for someone with a car. Defendant claims he did not kill Harris, he did not

learn of his murder until the next day, and denies confessing anything to his girlfriend, Littemi.

The first issue we address is whether the trial court erred in determining that Richard was not an accomplice and refusing defendant's requested jury instruction regarding Richard's role as an alleged accomplice. Defendant asserts that the trial court erroneously refused to instruct the jury that Richard was an accomplice whose testimony must be corroborated. Defendant claims that Richard's involvement in the Harris murder is similar to that of Rockymore, who was charged as an accomplice. Furthermore, defendant claims that based both on his deal with the state for lenient sentencing and the fact that he admitted he was a part of the plans to cover-up the murder by lying to Loverine Harris, the facts surrounding Richard's involvement in the Harris murder are subject to different interpretations. Defendant argues that Richard's participation in the Harris shooting was an issue for the jury to decide, and the trial court erred in usurping the jury's role by finding that Richard was not an accomplice.

An individual "who could have been indicted and convicted for the crime with which the accused is charged" may be charged as an accomplice. *State v. Jensen*, 289 Minn. 444, 184 N.W.2d 813, 815 (1971). If the state is able to prove "some knowing role in the commission of the crime" by a defendant who does nothing to stop the act, then the state has proven accomplice culpability. *State v. Russell*, 503 N.W.2d 110, 114 (Minn.1993) (quoting *State v. Merrill*, 428 N.W.2d 361, 367 (Minn.1988)). Where the facts of the case are undisputed and there is only one inference to be drawn as to whether or not the witness is an accomplice, then it is a question for the court to decide, but if the evidence is disputed or susceptible to different interpretations, then the question whether the witness is an accomplice is one of fact for the jury. *Jensen*, 184 N.W.2d at 815 (citing *State v. Hopfe*, 249 Minn. 464, 471, 82 N.W.2d 681, 686 (1957)).

---

4. Littemi later testified that defendant buried the gun. The gun was never found.

■ Nothing in the record before us suggests that Richard played a role in planning the murder or, unlike Rockymore, even had knowledge of the plan prior to its execution. Loverine Harris testified that her husband and Richard were close and when she saw Richard that evening, he appeared in shock. No witness claimed Richard was at the gathering where the plans to kill Harris were discussed, and Rockymore testified that he told Richard, before the shooting, that when he ran, Richard should run too, strongly suggesting Richard knew nothing of the impending plan to murder Harris. Therefore, we conclude that the trial court's determination that Richard was not an accomplice was not error.

■ In furtherance of his theory that Richard should have been deemed an accomplice, defendant requested the trial court read Crim JIG 3.18 which provides in pertinent part, "If you find that * * * (any person who has testified in this case) is a person who could be charged with the same crime as defendant, you cannot find defendant guilty of a crime on that testimony unless that testimony is corroborated." In response to this request, and notwithstanding the trial court's entirely appropriate conclusion that Richard was not an accomplice, the court instructed the jury:

> You cannot find defendant guilty of a crime on the testimony of a person who could be charged with that crime unless that testimony is corroborated by such other evidence which tends to convict the defendant of the crime. Such a person who could be charged for the same crime is called an accomplice.

In essence, defendant's requested instruction was given; however, it would not have been an abuse of discretion to refuse to give the requested instruction. Accordingly, we hold that under the facts of this case, the trial court did not err in determining that Richard was not an accomplice, and the court exercised appropriate discretion in giving the instruction on accomplice liability.

■ Next we address whether the evidence presented at trial was sufficient as a matter of law to sustain the conviction. In determining whether evidence is sufficient to support a conviction, this court examines the evidence in the light most favorable to the verdict and assumes that the jury disbelieved any testimony in conflict with the verdict. *State v. Scruggs,* 421 N.W.2d 707, 713 (Minn. 1988).

■ Rockymore was deemed an accomplice and therefore defendant's conviction cannot be based on his testimony "unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense." Minn.Stat. § 634.04 (1994). In addition, if the corroboration merely shows the commission of the offense or the circumstances thereof, it is not sufficient. *Id.* Corroborating evidence may be circumstantial or direct. *Scruggs,* 421 N.W.2d at 713. Defendant's entire conduct may be looked at for corroborating circumstances along with the defendant's association with those involved in the crime, or any opportunity, motive or proximity to the crime. *Id.*

■ With these standards in mind, we conclude there is no shortage of evidence as to defendant's role in the Harris murder. Loverine Harris testified that both her husband and defendant participated in the Haaf murder cover-up. Harris hid the Haaf murder weapons and defendant removed them from the Harris home a day later. When defendant later saw Harris being picked up by the police, Rockymore and Littemi, defendant's girlfriend, each testified that defendant believed Harris was "snitching." Rockymore testified that he was present at a meeting where defendant discussed "shutting" Ed down and that defendant specifically stated that he was going to kill Harris. Littemi testified that defendant told her prior to the murder that "Ed's got to go." Therefore, defendant's motive and intent to kill Harris were clearly established.

Further, Loverine Harris, Rockymore, Richard, and Maurice Levy, another Vice Lord, all testified that defendant was at the Harris home immediately prior to the murder. Each recounted how Harris was lured out of the house by defendant on that evening under the premise of either buying marijuana or fighting a rival gang member. As to the weapon, Littemi testified that she

loaned defendant a gun the day of the murder. Rockymore testified that he saw defendant with a gun on that day, and the gun and bullets Littemi described matched the gun used in the Harris murder, as described by Rockymore and Richard.

Rockymore and Richard each provided details of the actual shooting. Each testified that Harris was standing before he was shot by defendant, then fell to his knees and forward onto the ground, with at least one shot fired while he was laying on the ground. This is consistent with the medical examiner's testimony that Harris could not have remained standing after being shot in the back of the head, and that at least one bullet was stopped by something hard, suggesting he may have been shot while he was on the ground. Rockymore and Richard also testified that defendant came from behind Harris and fired a series of shots directly into Harris. This testimony was corroborated by neighbors who testified that they heard a series of steady and continuous gunshots.

Finally, defendant's confession to his girlfriend Littemi the day after the murder provided additional support for the state. Littemi testified in detail as to events occurring on the night of the murder, corroborating Rockymore and Richard's account of events. Her testimony that defendant told her he killed Harris because he was "snitching" corroborates Rockymore's and Richard's testimony.

In summary, a review of the evidence in the light most favorable to the verdict indicates there was evidence amply sufficient for the jury to conclude that defendant committed the Harris murder and that the accomplice testimony was sufficiently corroborated and supported the conviction.

The final issue is whether the impanelment of an anonymous jury violated defendant's right to a fair trial by an impartial jury by burdening his presumption of innocence. On October 15, 1993, proceedings began in the selection of the jury for defendant's trial. Prior to commencement of jury selection, the trial court made the following remarks:

Before we proceed further, let me advise you with respect to an issue involving juror anonymity. This case has and could receive publicity in the newspapers, on radio and television. Accordingly, many in the community may be curious about the identities of the jurors, and jurors could be exposed to opinions, comments and inquiries which could impair their ability to be impartial or which could create a perception of impartiality [sic].

I am concerned about how to make sure that outside influences or other activities which could divert a juror's attention from the evidence and permit people to pry into a juror's personal affairs or otherwise create a real or perceived interference with impartiality and fair discharge of a juror's function might be optimized.

Accordingly, I have under advisement at this time an order that your names, addresses and phone numbers will be available to the attorneys but will be anonymous to everyone else except to my staff. For the time being your names and identifying information has [sic] been made available to the attorneys but to no one else. * * * And in light of that order, you have received numbers and will be referred to by those numbers. And we apologize for the lack of personal contact that addressing you by numbers entails.

Before each potential juror was examined, the trial court once again explained that jurors would be referred to by number. The issue of anonymity was never raised by any jurors during the eight day voir dire process.

A fundamental guarantee of the United States Constitution is the right to a fair trial by an impartial jury. U.S. Const. amend. VI; *Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 1692–93, 48 L.Ed.2d 126 (1976). The Minnesota constitution has an identical provision. Minn. Const. art. I, § 6; *State v. Hamm,* 423 N.W.2d 379, 385 (Minn.1988). The presumption of innocence is an essential element of the right to a fair trial. *Williams,* 425 U.S. at 503, 96 S.Ct. at 1692–93; *State v. Wolske* 280 Minn. 465, 472, 160 N.W.2d 146, 151 (1968). A concern when impanelling an anonymous jury is that it potentially impinges the presumption of innocence. *U.S. v. Thomas,* 757 F.2d 1359, 1363 (2d Cir.) *cert. denied, Fisher v. United*

*States,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985); *see also Commonwealth v. Angiulo,* 415 Mass. 502, 615 N.E.2d 155, 171 (1993).

In *State v. Bowles,* 530 N.W.2d 521 (Minn. 1995), and *State v. McKenzie,* 532 N.W.2d 210 (Minn.1995), this court addressed the concern that jury anonymity could lead jurors to infer guilt and, as a result, place a burden on the presumption of innocence. In *Bowles,* we held that "an anonymous jury may be impanelled where the trial court: (a) determines there is strong reason to believe that the jury needs protection from external threats to its members' safety or impartiality; and (b) takes reasonable precautions to minimize any possible prejudicial effect the jurors' anonymity might have on the defendant." *Id.* at 530–31.

We further provided guidance to the trial courts in *Bowles* as to precautions that must be taken to address any possible prejudicial effect juror anonymity may have on defendant, and the mitigation of any possible prejudicial effect in order to protect defendant's rights:

> Those precautions must, at minimum, include extensive voir dire to expose juror bias and instructions designed to eliminate any implication as to the defendant's guilt. Although the trial court need not make written findings as to the jury's need for protection, it must place in the record a clear and detailed explanation of the facts underlying its determination that there is strong reason to believe the jury needs protection from external threats to its members' safety or impartiality. If the court chooses to explain to jurors why they are anonymous, the explanation should not unnecessarily burden the defendant's presumption of innocence.

*Id.* at 531.

■ We conclude, for the following reasons, that the trial court did not abuse its discretion in its determination to impanel an anonymous jury and that the safeguards set forth in *Bowles* to guarantee defendant's constitutional right to a fair trial by an impartial jury were fully met.

First, the trial court had strong reason to believe that the jury needed protection from external threats. The court was justified in taking into account the state's theory that Harris had been murdered because members of the Vice Lords thought he was providing police with information relating to the Haaf murder, and that concern for the safety of the jurors was not unreasonable, for in the event they were to convict defendant they too might be the target of some kind of violence. *See Bowles,* 530 N.W.2d at 531; *United States v. Scarfo,* 850 F.2d 1015, 1023 (3rd Cir.) *cert. denied, Scarfo v. United States,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988) (affirming the use of an anonymous jury where jurors would hear evidence that could reasonably lead them to fear for their safety and the safety of their families).

In addition, the trial court took the necessary precautions to minimize any prejudicial effect. The voir dire of the jurors included a requirement that jurors fill out an extensive questionnaire to expose any potential bias and each juror was subject to probing questions by defense counsel and counsel for the state regarding the juror's ability to be impartial. At the close of the trial, the trial court instructed the jury on the appropriate presumption of innocence and the state's burden to prove guilt beyond a reasonable doubt, and that the jury would remain anonymous due to the potential publicity in the newspapers, radio and television and the need to preserve impartiality. Consequently, we conclude that the trial court's decision to impanel an anonymous jury did not violate defendant's right to a fair trial by an impartial jury and appropriate precautions were taken to minimize any prejudicial effect of the jury's anonymity.

We affirm defendant's conviction and sentence for first-degree murder.

Affirmed.