**Larry FLOURNOY, petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

No. C6–97–1761.

Supreme Court of Minnesota.

Aug. 6, 1998.

2. *Id.*

3. *Id.*

566

Keith Ellison, Legal Rights Center, Minneapolis, Robert K. Magee, Hamline University Law School, St. Paul, for appellant.

Hubert H. Humphrey, III, Minnesota Atty. Gen., Michael O Freeman, Hennepin County Atty. by Paul Scoggin, Asst. Co. Atty., Minneapolis, for respondent.

## OPINION

GILBERT, Justice.

Petitioner Larry Flournoy appeals the denial of postconviction relief for his conviction for first-degree murder. Flournoy alleges a variety of errors and argues that the trial court abused its discretion in refusing to grant an evidentiary hearing on his postconviction petition on six grounds: 1) he was denied due process because the trial judge met secretly with other judges and decided to impanel anonymous juries in Flournoy's and related defendants' cases; 2) he was denied due process because a prosecution witness has recanted her testimony; 3) he was denied the right to an impartial jury because a prospective juror made statements against the defendant; 4) he received ineffective assistance of trial counsel because trial counsel failed to bring a *Batson* challenge; 5) he received ineffective assistance of trial counsel because trial counsel breached the attorney-client privilege and failed to examine bias in the venire panel; and 6) he was denied due process because of the totality of errors in his trial. We affirm.

Flournoy was convicted in November 1993 of first-degree murder for the killing of Ed Harris. Both Flournoy and Harris were members of the Vice Lords gang, and Harris was murdered because the Vice Lords suspected that he was cooperating with the Min-

neapolis Police Department's investigation of the murder of Officer Jerome Haaf. *State v. Flournoy,* 535 N.W.2d 354, 357–58 (Minn. 1995). The defendants in the murders of Harris and Officer Haaf were sometimes referred to collectively as the Minnesota Eight. Our opinion in Flournoy's direct appeal contains additional facts about the murder of Harris and Flournoy's conviction. *See id.* at 356–62.

Flournoy was tried by an anonymous jury. He claims that the decision to impanel an anonymous jury in his case and the cases of the defendants involved in the Haaf murder was made in a private meeting between the judge in his case and judges presiding over the trials of the Haaf murder defendants. As support, Flournoy points to an article in the *City Pages* newspaper in November 1994. In this article, the judge who presided over the trial of the first of the Haaf murder defendants stated that such a meeting took place, although the article does not specify which judges attended the meeting except for the then-chief judge. There is no evidence in the record from Flournoy's trial, however, of such a meeting, and the trial judge specifically denies attending or being invited to attend any meeting regarding the use of anonymous juries.

Before voir dire began, the trial court assigned numbers to all prospective jurors to maintain their anonymity. During jury selection, the trial court received an anonymous letter from a prospective juror alleging that Juror 7 had stated in front of other members of the pool, "I'm definitely going to be on the jury. All they have to do is bring me up there and he is guilty." The court suspected that the letter writer was Juror 24. During a discussion about the letter, Flournoy's counsel told the court that he had received confidential information from Flournoy about Juror 24 and was concerned that maintaining his client's confidence might create a fraud on the court: "I feel like I still must maintain a client confidence. But now * * * I feel like if I continue to do that, it might end up being a fraud on the Court. And I don't want, obviously, to do that. So if the Court orders me to disclose, I can do that." The court immediately ordered counsel to disclose

the information. Counsel stated that Flournoy told him that Juror 24 had attended meetings or rallies on behalf of the Minnesota Eight, although Flournoy himself had no connection to Juror 24. Counsel told the court that Flournoy had asked him not to reveal the information but that he had explained to Flournoy that he could not commit a fraud on the court.

Although Flournoy had already exercised a peremptory challenge to remove Juror 7, the trial court brought him back for questioning. He denied having made the remarks contained in the letter. The court then examined Juror 24, a young African–American man who admitted to the court that he had written the anonymous letter about Juror 7's statements. The court asked Juror 24 whether he was familiar with any of the groups that had an interest in Flournoy's case or the cases of the Haaf murder defendants. Juror 24 responded that he had heard about the Committee for the Minnesota Eight but did not know anyone involved in that group and had never attended any of their meetings or rallies. The state exercised a peremptory challenge to remove Juror 24, which the court accepted. Flournoy's counsel did not make a *Batson* challenge.[1]

At trial, Ayieko Littemi, Flournoy's then-girlfriend, testified that Flournoy confessed to her the day after the murder that he had killed Harris. *Flournoy,* 535 N.W.2d at 358–59. Flournoy claims that Littemi has recanted her testimony and attempted without success to give statements in July 1996 to both the Hennepin County Attorney's Office and the Attorney General's Office. In support, Flournoy submitted with his petition the affidavit of Sherron Aniemeka, who asserts that she "believe[s]" Littemi is willing to provide "corrective" testimony to the court. Aniemeka states that she went with Littemi when she attempted to recant her testimony and that both offices refused to take Littemi's statement.

In his direct appeal, Flournoy contended that the trial court's decision to impanel an anonymous jury violated his right to a fair

trial. *Flournoy,* 535 N.W.2d at 356. He also challenged the court's refusal to issue a requested jury instruction and asserted that the evidence presented at trial was insufficient as a matter of law to support his conviction. *Id.* We affirmed his conviction in August 1995. *Id.* Relying on our decisions in *State v. Bowles,* 530 N.W.2d 521 (Minn.1995) and *State v. McKenzie,* 532 N.W.2d 210 (Minn.1995)—affirming the use of anonymous juries in the trial of two of the Haaf murder defendants—we concluded that the trial court did not abuse its discretion by impaneling an anonymous jury for Flournoy's trial. *Id.* at 362. We also held that procedural safeguards designed to ensure Flournoy's right to a fair trial were fully met. *Id.*

After his conviction was affirmed, Flournoy petitioned for postconviction relief, contending that 1) the trial court's participation in a meeting with other judges regarding the decision to impanel anonymous juries in the Haaf and Harris murder cases denied him due process; 2) Littemi's allegedly false testimony at trial denied him due process; 3) the jury panel was tainted by the misconduct of Juror 7, pretrial publicity, and juror anonymity; 4) trial counsel was ineffective in breaching attorney-client privilege and in failing to make a *Batson* challenge to the state's removal of an African–American juror; 5) appellate counsel was ineffective in failing to raise on appeal the denial of petitioner's right to be present at certain pretrial conferences; and 6) the totality of errors at trial denied him due process.

The postconviction court, which was also the trial court, denied Flournoy's petition. The court denied attending or being invited to attend any such meeting with other judges about the use of anonymous juries and noted that no admissible evidence supported the allegation. The court also concluded that even if some judges had met to discuss concerns about the right to a fair trial and juror safety, "it is highly unlikely that such a fact would give rise to the kind of evidence which would warrant postconviction relief," especially after this court had concluded in Flour-

---

**1.** In *Batson v. Kentucky,* the United States Supreme Court outlined a three-step procedure for the trial court to use in analyzing a claim that the state's use of a peremptory challenge was motivated by racial discrimination. 476 U.S. 79, 97–98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

noy's direct appeal that the trial court's handling of jury issues did not deprive him of the right to a fair trial. The court dismissed the claim that Littemi sought to recant her trial testimony as unsupported, stating that it was based only on hearsay. Regarding Juror 7's alleged anti-defendant statement, the court pointed out that it was fully addressed before trial and that Flournoy therefore knew about the issue on direct appeal. The court concluded that any prospective juror who overheard Juror 7 "would regard it as a remark of one not fit to serve and one made without any basis." Likewise, the court held that the issue of pretrial publicity was known on appeal and that Flournoy had made no showing that pretrial publicity interfered with his right to a fair trial. The court dismissed counsel's failure to make a *Batson* challenge as yet another issue known on appeal and stated that the decision not to make the challenge was a matter of trial strategy. Finally, the court held that Flournoy had made no showing that he was not present at any proceeding when his presence was required, or that his absence at any proceeding interfered with his right to a fair trial. The court concluded that the petition fell far short of being meritorious and that ordering an evidentiary hearing would serve no purpose.

■ A postconviction court must grant a petition for an evidentiary hearing only when the petitioner alleges facts that, if proved, would entitle him to the requested relief. *Fratzke v. State*, 450 N.W.2d 101, 102 (Minn. 1990). Moreover, the allegations contained in the petition must be "more than argumentative assertions without factual support." *Hodgson v. State*, 540 N.W.2d 515, 517 (Minn.1995) (quoting *Beltowski v. State*, 289 Minn. 215, 217, 183 N.W.2d 563, 564 (1971)). Under the rule we developed in *State v. Knaffla*, we will not consider in a postconviction petition issues that the petitioner raised on direct appeal or knew about at the time of appeal. 309 Minn. 246, 252, 243 N.W.2d 737, 741 (1976); *see also Miller v. State*, 531 N.W.2d 491, 493 (Minn.1995). We recognize, however, an exception to the *Knaffla* rule and will allow a claim to be presented if it is "so novel that its legal basis was not reasonably available at the time of the direct ap-

peal" or in limited situations when fairness requires a hearing. *Russell v. State*, 562 N.W.2d 670, 672 (Minn.1997). On review, we will not disturb the postconviction court's decision to deny an evidentiary hearing unless the lower court abused its discretion. *Scruggs v. State*, 484 N.W.2d 21, 25 (Minn. 1992).

## I.

■ Flournoy contends that his due process rights were violated because the trial court participated in a meeting with other judges presiding over cases related to the Haaf murder at which they decided to use anonymous juries. Flournoy's evidence that this meeting occurred is an article published on November 2, 1994 in the *City Pages* about a Hennepin County District Judge. The article quotes a Hennepin County trial judge as stating that before the Haaf murder defendants went to trial, the chief judge summoned the judges "involved in the Haaf trials to get together." At the meeting, the judges allegedly decided that the jurors needed to be granted anonymity.

■ In Flournoy's case, however, the postconviction judge, who was also the trial judge, explicitly denied that he was present at the meeting or had even been invited to participate. And Flournoy submitted no additional evidence to dispute the judge's statement. As such, Flournoy's contention is a mere assertion without underlying factual support and thus will not be considered. *See Hodgson*, 540 N.W.2d at 517. Finally, even if Flournoy had presented evidence that the trial judge participated in this meeting, such a meeting would not have violated his due process rights. In two cases involving postconviction petitions by two of the Haaf murder defendants, we held that this meeting, if it indeed took place, did not violate the petitioners' due process rights. *See McKenzie v. State*, 583 N.W.2d 744, 746–48 (Minn., 1998); *Kambon v. State*, 583 N.W.2d 748, 751 (Minn., 1998). We have already concluded that Flournoy received appropriate due process protections regarding the use of an anonymous jury at his trial, and Flournoy fails to show that he was prejudiced in any

way. *See Flournoy,* 535 N.W.2d at 361–62. We thus conclude that Flournoy's petition presents no evidence that his due process rights were violated based on this alleged meeting.

## II.

■ Flournoy argues that a critical prosecution witness, his former girlfriend Ayieko Littemi, has recanted her trial testimony. Therefore, he contends that his conviction based on her allegedly false testimony denied his right to due process. In support of this allegation, Flournoy submits a brief affidavit by a friend of Littemi stating that Littemi has twice attempted to recant her testimony but that neither the Hennepin County Attorney's Office nor the Attorney General's Office would take her statement. The postconviction court concluded that this allegation was unsupported because it was based solely on hearsay.

■ This issue is properly raised in a postconviction petition because Littemi allegedly did not seek to recant her testimony until July 1996, almost a year after we issued our opinion in Flournoy's direct appeal. Nonetheless, "the courts have traditionally looked with disfavor on motions for a new trial based on recantations unless extraordinary or unusual circumstances exist." *Daniels v. State,* 447 N.W.2d 187, 188 (Minn. 1989). To receive a new trial based on recantation of testimony, Flournoy must show that 1) the testimony was false; 2) he was surprised by the testimony and was unable to counteract it or did not know it was false until after the trial; and 3) the jury might have reached a different conclusion if it had not considered the false testimony. *Parker v. State,* 437 N.W.2d 65, 66 (Minn.1989).

The affidavit Flournoy submits falls far short of meeting any of the requirements to establish a valid claim for a new trial based on recanted trial testimony. First, the affidavit does not state what Littemi's new testimony would be; it merely states that the affiant "believe[s]" that Littemi is willing to provide "corrective" testimony to the court. Thus, it is not clear to what extent Littemi's testimony at trial was false or what her "corrected" version of events would be. Second, Flournoy clearly knew about Littemi's testimony and should have been able to counteract it at trial since the testimony involved Flournoy's confession to her that he killed Harris. Third, Flournoy provides no evidence that the jury would have reached a different conclusion if Littemi had not testified. Indeed, this seems highly implausible given that several eyewitnesses testified that they saw Flournoy shoot Harris in the back of the head. *See Flournoy,* 535 N.W.2d at 358. We therefore conclude that Flournoy's due process rights were not violated based on Littemi's allegedly recanted testimony.

## III.

■ Flournoy argues that he was denied due process because the trial court failed to hold a *Schwartz* hearing to explore the effect of Juror 7's anti-defendant remarks on the rest of the jury pool. The trial court granted Flournoy's peremptory challenge to Juror 7, but then brought Juror 7 back for extensive questioning about the allegedly anti-defendant remarks he made. The trial court did not, however, examine whether other potential jurors had heard Juror 7's remarks and, if so, what effect those remarks had on the jurors' attitude toward Flournoy. The postconviction court correctly pointed out in its memorandum that Flournoy knew about this issue before trial even began because Juror 7's anti-defendant statements were the subject of extensive discussion during jury selection. We thus hold that Flournoy's failure to raise the issue in his direct appeal precludes us from considering it in his postconviction petition. *See Hodgson,* 540 N.W.2d at 517; *Knaffla,* 309 Minn. at 252, 243 N.W.2d at 741.

## IV.

■ Flournoy argues that he received ineffective assistance of trial counsel because counsel failed to bring a *Batson* challenge to the state's use of a peremptory challenge to excuse Juror 24, a young African–American man. Like the issue of Juror 7's statements, however, Flournoy knew of trial counsel's failure to make a *Batson* challenge before trial even began and thus should have raised this issue on direct appeal. *See Hodgson,*

540 N.W.2d at 517; *Knaffla*, 309 Minn. at 252, 243 N.W.2d at 741.

 Even if Flournoy's ineffective assistance of counsel claim had been properly raised, Flournoy would not prevail. To make the requisite showing, he would have to present evidence that counsel's representation fell below an objective standard of reasonableness, and that but for counsel's deficient performance the outcome of trial would have been different. *Scruggs v. State*, 484 N.W.2d 21, 25 (Minn.1992). First, counsel's performance did not fall below an objective standard of reasonableness. To bring a *Batson* challenge, a defendant's counsel must make a prima facie showing that the state exercised a peremptory challenge on the basis of race; the burden then shifts to the state to articulate a race-neutral explanation for striking the juror in question; and then the trial court must determine whether the defendant met his burden of proving intentional discrimination. *State v. Gaitan*, 536 N.W.2d 11, 15 (Minn.1995) (citing *Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). Here the trial court found that a valid non-racial ground existed for the state's exercise of a peremptory challenge to excuse Juror 24 because Juror 24 may have been connected to groups rallying for the Minnesota Eight defendants. Because the state had a nondiscriminatory motive to strike Juror 24, Flournoy's trial counsel would not have prevailed had he made a *Batson* challenge. In this situation, the decision not to make the challenge was an objectively reasonable decision of trial strategy. Thus, Flournoy does not have a valid claim for ineffective assistance of counsel regarding counsel's failure to bring a *Batson* challenge.

## V.

 Flournoy also contends that he received ineffective assistance of counsel because trial counsel breached attorney-client privilege by revealing that Flournoy told him that Juror 24 had attended rallies on behalf of the Minnesota Eight. Trial counsel told the court that he had information from Flournoy that he believed might lead to perpetrating fraud on the court; the court

then ordered counsel to reveal the information. This issue too was known to Flournoy before his trial began, and thus his failure to raise it on direct appeal precludes review of it in a postconviction proceeding. *See Knaffla*, 309 Minn. at 252, 243 N.W.2d at 741.

 Even if we were to consider this issue, Flournoy again could not show that he received ineffective assistance of counsel. First, trial counsel's compliance with the judge's order to reveal the information was objectively reasonable. Minnesota Rule of Professional Conduct 8.4(c) prohibits engaging in conduct involving fraud, and Rule 1.6(b)(2) allows an attorney to reveal a client's confidence when required by a court order. Second, even if compliance with rules of professional conduct was objectively unreasonable, Flournoy has made no showing that the outcome of his trial would have been different if his counsel had not warned the court that Juror 24 might have some connection to advocates for the Minnesota Eight. Therefore, Flournoy does not have a valid claim for ineffective assistance of counsel regarding counsel's court-ordered breach of attorney-client privilege.

## VI.

Finally, Flournoy argues that the totality of the errors at his trial denied him due process. *See State v. Schwartz*, 266 Minn. 104, 113–114, 122 N.W.2d 769, 775–776 (1963) (holding that a combination of errors at trial required granting defendant a new trial). This contention has no merit. We determined on direct appeal that Flournoy's trial complied with all relevant procedural and constitutional protections, and Flournoy has not raised any valid and reviewable claims of error in his postconviction petition. *See Flournoy*, 535 N.W.2d at 359–62. We therefore affirm the postconviction court's decision to deny Flournoy's petition for an evidentiary hearing.