STATE of Minnesota, Respondent,

v.

Prentis Cordell JACKSON, Appellant.

No. A07–395.

Supreme Court of Minnesota.

April 10, 2008.

Lori Swanson, Attorney General, St. Paul, Michael O. Freeman, Hennepin County Attorney, David Craig Brown, Assistant County Attorney, Minneapolis, for respondent.

John Stuart, State Public Defender, Sara Lynne Martin, Assistant Public Defender, St. Paul, for appellant.

## OPINION

ANDERSON, G. BARRY, Justice.

Appellant Prentis Cordell Jackson was convicted of first-degree murder for the killing of Michael Anthony Bluntson, Jr., in Minneapolis. On direct appeal, appellant seeks the reversal of his conviction on the basis that the district court declined to give the jury an accomplice corroboration instruction. We affirm appellant's conviction.

Michael Anthony Bluntson, Jr., was killed near the intersection of 25th Avenue North and Sixth Street North in Minneapolis on February 24, 2006. A medical examiner testified that Bluntson died from a gunshot to the head fired at "intermediate range." Although the precise caliber of the bullet retrieved from Bluntson's body was not determinable, the bullet's weight was similar to that of a .45–caliber bullet. The police did not recover the murder weapon in the course of their investigation.

Deshawn Jenkins and Alfred Lamar were members of a gang known as the EMB ("Emerson Money Boys" or "Emerson Murder Boys"). Lemuel Radcliffe and appellant's cousin Bernard Williams joined with the EMB as part of a consolidated gang known as the LMB ("Lyndale Mob Boys"). Jenkins, Lamar, and Williams testified at trial, but Radcliffe did not. Lamar testified that appellant was a member of the LMB. Some of the gang members sold marijuana and crack cocaine outside Wafana's, a store located at the intersection of 24th Avenue North and Lyndale Avenue North in Minneapolis. Bluntson was believed by some individuals to be a member of another gang known as the 2's & 3's. Williams testified that appellant had previously accused Bluntson of stealing sacks of marijuana that appellant had hidden inside Wafana's, but Leshaun Taylor testified that he and Bluntson were best friends and that he was unaware of any dispute between Bluntson and appellant.

Jenkins, Lamar, and Williams testified as to the events surrounding Bluntson's murder. On the afternoon of February 24, 2006, Williams was shot in the left arm while standing outside Wafana's by a person whom he believed to be a member of the 2's & 3's and whom he had seen with Bluntson on prior occasions. Williams testified that he removed his gray sweatshirt as he fled the scene. After the shooting,

Williams saw appellant at the home of Shalonda Young, which is located in the 2200 block of Sixth Street North in Minneapolis. Appellant allegedly observed that Williams had been shot but did not ask who had shot him. Lamar testified that he saw appellant on Broadway, a North Minneapolis street, after the shooting. According to Lamar, appellant told Lamar that he had heard that the 2's & 3's shot Williams and declared that if he caught one of them he would "f* * * them up."

Jenkins, Lamar, Radcliffe, Williams, and Bluntson were at Wafana's later in the day. Photographs from the Wafana's surveillance camera that were introduced at trial established that Jenkins, Lamar, and Williams left the store at 6:27 p.m. and that Bluntson left the store at 6:28 p.m. According to Williams, Jenkins and Radcliffe got into an argument with Bluntson after they left Wafana's. Williams testified that Jenkins ordered Bluntson to leave and that Radcliffe told Bluntson, "[Y]our man shot my man." Jenkins, in contrast, denied that any such argument occurred. A police officer testified that a Wafana's employee told him that there had been an argument in the store shortly before Bluntson was shot.

Radcliffe drove Jenkins, Lamar, and Williams in Radcliffe's Suburban to Young's house, where they remained for a couple of minutes before appellant joined them in the vehicle and Radcliffe drove away with his passengers. Near the intersection of 25th Avenue North and Sixth Street North, Radcliffe drove by Bluntson, who was walking on the sidewalk. Williams testified that Radcliffe said, "[T]here he go right there." Lamar testified that someone in the Suburban sug-

gested that appellant "box" Bluntson and that appellant stated that he was going to "crush him." Radcliffe stopped the Suburban, and appellant left the vehicle. According to Williams, when appellant got out of the Suburban he said, "I got something for this nigger."

Lamar testified that appellant approached Bluntson on the sidewalk and that the two of them assumed boxing stances. According to Lamar, appellant pulled a gun from his waist and pulled the trigger, but the gun did not fire. Appellant then pulled the trigger a second time, the gun fired, and Bluntson stumbled, grasping his face. Lamar related that someone in the Suburban said, "Shit, he shot him. He just f* * *ing shot him." According to Lamar, the Suburban's other occupants neither planned to shoot Bluntson nor indicated that they knew appellant was going to shoot him, and they were "surprised," "shook up," and "panicking" after the shooting. Although Jenkins and Williams did not see appellant shoot Bluntson, they both testified to hearing one gunshot after appellant got out of the Suburban.

Rosalba Trejo, who resides in the 2400 block of Sixth Street North, testified that she heard gunshots and watched the victim run, fall, and then get up, run, and fall again. Radcliffe drove away, and appellant ran through some yards, met up with the Suburban, and reentered the vehicle.[1] Williams testified that someone asked appellant what he did, to which appellant responded, "I shot him in his f* * *ing face." The group returned to Young's house after the shooting, and Lamar observed appellant empty the shells out of his gun and place them in his pocket.

1. Williams indicated that Radcliffe drove away when appellant left the vehicle, but Lamar indicated that Radcliffe did not drive away until after the shot was fired. Further-more, Lamar claimed that he left the Suburban as appellant reentered the vehicle after the shooting.

Jenkins testified that everyone at Young's house was talking about the shooting and that appellant explained that "he lift[ed] the gun up," "it went click," and then "it kind of went boom." According to Jenkins, although appellant was wearing a black hooded sweatshirt when appellant got into the Suburban at Young's house, he saw appellant wearing Williams's gray sweatshirt at Young's house after the shooting. At trial, Jenkins's and Lamar's descriptions of the gun they saw in appellant's possession after the shooting and Williams's description of a gun he had previously seen in appellant's possession were substantially similar.

Frederick Anthony testified that after the shooting he was at Young's house, where he overheard appellant confess that he shot Bluntson. But Anthony repeatedly contradicted himself in his testimony regarding whether it was appellant or someone else who confessed and whether he was under police pressure to testify against appellant. Anthony also admitted that he was drunk when he heard the confession.

At approximately 6:42 p.m. on February 24, Minneapolis police officers received a dispatch call reporting the shooting. The police found Bluntson's body on 25th Avenue North, slightly east of Sixth Street North, and a trail of blood revealed that Bluntson had run a short distance after being shot. John Sparkman told Sergeant Christopher Thomsen at the scene that Bluntson called Sparkman at approximately 6:30 p.m. to tell him "that he was having some trouble with some EMB's" at Wafana's. Sparkman said he advised Bluntson to try to reach Sparkman's house safely. Thomsen looked at Sparkman's cell phone and confirmed that the call was received at 6:33 p.m. When asked at trial if a person who left Wafana's at 6:27 p.m. could drive to the 2200 block of Sixth Street North

and then back to the intersection of 25th Avenue North and Sixth Street North by 6:42 p.m., Sergeant Michael Keefe answered that a person "could walk it in that time."

Sergeant Thomsen testified that while the police were investigating the crime scene, a woman called and disclosed that she had been at Young's house, where she heard people talking about the shooting and observed young men with guns. When the police searched Radcliffe's Suburban, they found a bag that contained a gray sweatshirt with nine unfired .45–caliber bullets in a pocket and blood around the collar. A forensic scientist testified that the bullet retrieved from Bluntson's body could have been a .45–caliber bullet, and Sergeant Thomsen testified that the bullet "was in the category of a .45 or larger." The DNA profile of the blood on the sweatshirt matched Williams's DNA profile, and Williams identified the sweatshirt as the one he was wearing when he was shot. Williams testified that there were no bullets in his sweatshirt when he removed it as he fled Wafana's and that he did not know why his sweatshirt was in the Suburban. There is no evidence that Williams possessed the sweatshirt after he took it off earlier in the day.

Appellant was indicted for first-degree premeditated murder under Minn.Stat. § 609.185(a)(1) (2006) and second-degree unpremeditated murder under Minn.Stat. § 609.19, subd. 1(1) (2006). At trial, appellant's counsel argued "that the facts are pretty close to being right, [but] they just got the wrong guy." Appellant testified that he was not at Young's house on February 24, that he had nothing to do with the killing, and that he did not learn of Bluntson's death until almost a week after it occurred. Appellant also testified that he had argued with Williams a couple of weeks before the shooting.

Appellant's counsel requested that the district court give the jury an accomplice corroboration instruction. The court declined appellant's request on the grounds that "none of these parties would have been chargeable with the crime" and that appellant claimed "he wasn't even present at the scene." The jury found appellant guilty of first-degree murder on November 8, 2006, and he was sentenced to life imprisonment without parole.

■■■ Appellant argues that the district court erred in declining to give the jury an accomplice corroboration instruction with respect to the testimony of DeShawn Jenkins, Alfred Lamar, and Bernard Williams. Under Minn.Stat. § 634.04 (2006), a defendant may not be convicted based "upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense." Because an accomplice's credibility is inherently suspect, "[a]n accomplice instruction 'must be given in any criminal case in which any witness against the defendant might reasonably be considered an accomplice to the crime.'" *State v. Lee*, 683 N.W.2d 309, 316 (Minn. 2004) (quoting *State v. Shoop*, 441 N.W.2d 475, 479 (Minn.1989)). "When it is unclear whether a witness is an accomplice or not, it generally becomes a question of fact for the jury to decide." *State v. Reed*, 737 N.W.2d 572, 582 (Minn.2007). But when "the facts of the case are undisputed and there is only one inference to be drawn as to whether or not the witness is an accomplice, then it is a question for the court to decide." *State v. Flournoy*, 535 N.W.2d 354, 359 (Minn.1995). "The decision to give a requested jury instruction lies in the discretion of the trial court and will not be reversed absent an abuse of that discretion." *State v. Palubicki*, 700 N.W.2d 476,

487 (Minn.2005). We review a district court's refusal to give a requested accomplice corroboration instruction using a harmless error analysis. *Shoop*, 441 N.W.2d at 479–80.

■■■ Our "general test for determining 'whether a witness is an accomplice for purposes of section 634.04 is whether he could have been indicted and convicted for the crime with which the accused is charged.'" *Lee*, 683 N.W.2d at 314 (quoting *State v. Henderson*, 620 N.W.2d 688, 701 (Minn.2001)). "A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn.Stat. § 609.05, subd. 1 (2006). For purposes of imposing accomplice liability, "we distinguish between playing 'a knowing role in the crime' and having '[a] mere presence at the scene, inaction, knowledge and passive acquiescence.'" *Palubicki*, 700 N.W.2d at 487 (alteration in original) (quoting *State v. Gates*, 615 N.W.2d 331, 337 (Minn.2000)).

We agree with respondents contention that Jenkins and Lamar could not have been indicted and convicted for Bluntsons murder because their mere presence with appellant does not render them his accomplices. Although Jenkins and Lamar were with appellant at the time of the shooting, there is no evidence that they intentionally aided, advised, hired, counseled, or conspired with appellant or otherwise procured appellant to murder Bluntson. *See* Minn.Stat. § 609.05, subd. 1. The evidence suggests that Jenkins and Lamar may have known that appellant intended to fight Bluntson, but there is no evidence that they knew appellant intended to kill Bluntson.[2]

---

**2.** A stronger argument can be made that Radcliffe was appellants accomplice, as Radcliffe

picked up appellant at Youngs house, drove him to the site of the shooting, pointed out

The facts of this case are similar to the facts of *State v. Flournoy,* in which we rejected the defendants claim that the district court erred in declining to give the jury an accomplice corroboration instruction. 535 N.W.2d at 359–60. In *Flournoy,* the witness accompanied the defendant and several other men into an alley. *Id.* at 358. The witness testified that he noticed the defendant and another man whispering to one another and that as they began to walk into the alley the man who had been whispering to the defendant warned the witness, "[W]hen I run, you better run too." *Id.* The defendant shot the victim, an alleged "snitch," in the back of the head. *Id.* The witness then accompanied the defendant to the victims home, where the defendant lied to the victims wife about what had occurred. *Id.* We rejected the defendants argument that the witness was an accomplice, stating that "[n]othing in the record before us suggests that [the witness] played a role in planning the murder or * * * even had knowledge of the plan prior to its execution." *Id.* at 360. Here, as with the witness in *Flournoy,* the mere presence of Jenkins and Lamar with appellant before, during, and after the shooting does not render them his accomplices.

Appellant's reliance on *State v. Gates,* 615 N.W.2d 331 (Minn.2000), and *State v. Ostrem,* 535 N.W.2d 916 (Minn.1995), is misplaced. In *Gates,* 615 N.W.2d at 338, we concluded that there was sufficient evidence to support a guilty verdict for aiding and abetting first-degree murder where "[t]he only rational inference from the evidence [was] that [the defendant] intentionally transported [the shooter] * * * so that [the shooter] could shoot [the victim]."

Likewise, in *Ostrem,* 535 N.W.2d at 924–26, 924 n. 10, we concluded that there was sufficient evidence to support a guilty verdict for aiding and abetting second-degree burglary and theft where there was no "rational explanation for [the defendant's] presence other than participation in the crime." In this case, on the other hand, there is no evidence supporting the indictment and conviction of Jenkins and Lamar because they were mere passengers in the vehicle.

■ We need not decide whether Williams was an accomplice because even if he were an accomplice, the district court's failure to give the jury an accomplice corroboration instruction was harmless. When determining whether a district court's error in declining to give an accomplice corroboration instruction is harmless, we consider whether the testimony of the accomplice "was corroborated by significant evidence," "whether the accomplice testified in exchange for leniency," whether the prosecution emphasized the accomplice's testimony in closing argument, and whether the court gave the jury general witness credibility instructions. *State v. Jackson,* 726 N.W.2d 454, 461 (Minn.2007); *see also State v. Gail,* 713 N.W.2d 851, 864–65 (Minn.2006); *Lee,* 683 N.W.2d at 316–17. The strong corroboration of Jenkins's and Lamar's non-accomplice testimony, the absence of evidence that Williams testified at trial in exchange for leniency, and the general instructions the district court gave the jury on witness credibility convince us that any error in the district court's refusal to give the jury an accomplice corroboration instruction was harmless.

Bluntson walking on the sidewalk, stopped the Suburban, and picked up appellant after the shooting. But because Radcliffe did not testify at trial, these facts are irrelevant to determining whether the district court erred in declining to give the jury an accomplice corroboration instruction.

Because neither Jenkins nor Lamar could have been indicted and convicted for Bluntson's murder and any error in failing to give the jury an accomplice corroboration instruction as to Williams was harmless, we affirm appellant's conviction.[3]

DIETZEN, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

PAGE, Justice (dissenting).

I respectfully dissent. An obvious problem presented by this case is the fact that the testimony of Jenkins, Lamar, and Williams is as untrustworthy and unreliable as that of an obvious accomplice. Jenkins, Lamar, and Williams all had a motive to testify against Jackson in the hope of avoiding criminal liability for any role they may have played in Bluntson's death. Thus, I believe that the purpose underlying our requirement that a conviction not rest on the uncorroborated testimony of an accomplice should also apply with equal force to situations in which the only direct evidence of the defendant's actual involvement in the charged crime comes from witnesses who were present when the crime took place, had a motive to commit the crime, and whose testimony is not only the only testimony incriminating the defendant but is also the only evidence exculpating the witness.

"Accomplice testimony is inherently untrustworthy because the accomplice may testify against the defendant in the hopes of obtaining clemency for himself." *State v. Reed*, 737 N.W.2d 572, 582 (Minn.2007). Therefore, a conviction cannot rest on the uncorroborated testimony of an accomplice. Minn.Stat. § 634.04 (2006); *State v.*

*Clements*, 82 Minn. 434, 443, 85 N.W. 229, 232 (1901). As a result, " 'trial courts have a duty to instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider any witness against the defendant to be an accomplice.' " *Reed* 737 N.W.2d at 582 (quoting *State v. Strommen*, 648 N.W.2d 681, 689 (Minn.2002)). Generally, a witness will be considered an accomplice if the witness "could have been indicted and convicted for the crime with which the accused is charged." *State v. Lee*, 683 N.W.2d 309, 314 (Minn.2004). The court concludes that, because Jenkins and Lamar were merely present at the time Bluntson was shot, they could not have been indicted and convicted of the shooting and therefore were not accomplices. As a result, the court concludes that the trial court did not err when it declined to give the accomplice instruction. The court also concludes that any error in the trial court's failure to give an accomplice instruction as to Williams was harmless because the record contains sufficient evidence from Lamar and Jenkins's testimony to corroborate Williams's testimony.

While the court's conclusion that Jenkins and Lamar were not accomplices because there is no evidence that they intentionally aided, advised, hired, counseled, conspired with or otherwise procured Jackson to murder Bluntson is arguably technically correct, our analysis should not end there. The fact that the State may have lacked sufficient evidence to charge and convict Williams, Jenkins, and Lamar of aiding and abetting Jackson, or of committing the murder independent of Jackson's involvement, does not overcome the inherent untrustworthiness of statements made and testimony given by these three

---

3. Respondent argues that the witnesses were not accomplices because they were alternative perpetrators under appellant's version of the facts. Based on the facts of this case, we need not, and do not, reach that issue.

obvious suspects. While it is true that there was no evidence offered at trial that Jenkins and Lamar were anything other than merely present when Bluntson was killed, it is also true that the only evidence establishing that they were merely present came from Jenkins, Lamar, and Williams. Absent their testimony, there are no facts in the record detailing Jackson's involvement in the shooting. Their testimony, like that of an accomplice, is inherently untrustworthy because they had a strong incentive to shift the blame away from themselves and on Jackson. By shifting the blame to Jackson, they took the spotlight off of their involvement. Because their testimony is inherently untrustworthy, it should receive the same scrutiny that the legislature has required for accomplice testimony.[1] Therefore, we should hold that Jackson's conviction cannot rest on their testimony absent sufficient corroboration of that testimony.

Here, the record suggests that Jenkins, Lamar, and Williams may well have been highly motivated to engage in shifting the blame to Jackson. On the afternoon of February 24, 2006, Williams was shot while standing outside a North Minneapolis convenience store. Williams survived the shooting. Later that afternoon, one or more members of a group of people, including Williams, Jenkins, Lamar, and Radcliffe, were involved in an argument with Bluntson at the same store where Williams had been shot. The group left the store at 6:27 p.m. in Radcliffe's vehicle and drove to a house where Jackson joined them. At some point the group, now including Jackson, drove away from the house in Radcliffe's vehicle and encountered Bluntson, at which point, according to the testimony of Jenkins, Lamar, and Williams, Jackson got out of the vehicle

and without provocation shot Bluntson. Further, according to Jenkins, Lamar, and Williams, they had no reason to know that Jackson was going to shoot Bluntson. Jenkins's, Lamar's, and Williams's version of events is entirely self-serving. Their self-serving testimony is completely uncorroborated except by one another. Based on the uncorroborated testimony of three obvious suspects, no reasonable jury could have found that the State had proven beyond a reasonable doubt that Jackson shot Bluntson. Therefore, I would reverse Jackson's conviction.

---

1. The legislature may wish to consider whether the policy considerations underlying Minn. Stat. § 634.04 apply equally to suspects as well as accomplices.