**STATE of Minnesota, Respondent,**

v.

**Brandon Dominic COX, Appellant.**

No. A11–0240.

Supreme Court of Minnesota.

Sept. 19, 2012.

542

Lori Swanson, Attorney General, Saint Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

David Merchant, Chief Appellate Public Defender, Lydia Villalva Lijó, Assistant State Public Defender, Saint Paul, MN, for appellant.

## OPINION

ANDERSON, PAUL H., Justice.

A Hennepin County jury found Brandon Dominic Cox guilty of first-degree felony murder, second-degree intentional murder, and being a prohibited person in possession of a firearm for the shooting death of cab driver James Moody. Following the jury's verdicts, the Hennepin County District Court convicted Cox of each count, including the second-degree murder count. The court then sentenced Cox to life in prison with the possibility of parole on the first-degree felony murder conviction, and to a 60–month concurrent sentence on the prohibited person in possession of a firearm conviction; but, the court did not sentence Cox on the second-degree intentional murder conviction. On appeal, Cox makes three arguments: (1) the court erred by failing to instruct the jury that it could not find Cox guilty based on uncorroborated accomplice testimony, (2) the court erred by instructing the jury to continue deliberating after the jury indicated it was deadlocked, and (3) the court erred by convicting Cox of both first- and second-degree murder. We vacate Cox's second-degree intentional murder conviction, but we otherwise affirm Cox's convictions.

On February 4, 2007, at 3:45 a.m., a Rainbow Taxi cab driver and his passenger discovered the body of cab driver James Moody outside the Brookhaven apartment complex[1] in Brooklyn Center, Minnesota. The Rainbow Taxi cab driver and his passenger found Moody's body lying face down outside the driver's-side front door of Moody's Green and White Taxi cab.[2] The passenger called 911.

Police officers arrived at the crime scene within 10 minutes of the 911 call. Upon arrival at the scene, the officers found Moody's Green and White Taxi cab parked along the curb next to the entrance to the Brookhaven apartment complex. The officers observed that the cab's meter was running. The officers also found Moody's body lying outside the driver's-side front door of the cab and observed a small amount of frozen blood surrounding a gunshot wound on Moody's back. The officers began investigating the scene. In the course of their investigation, the officers found one shell casing on the ground near Moody's body, and another shell casing on the driver's-side floorboard of the cab. Eventually, the officers found a third shell casing on the cab's front passenger seat. The officers also found about $127 dollars in Moody's wallet and $25 on the front passenger seat of the cab.

Soon after the first police officers arrived at the crime scene, other police officers, emergency personnel, and crime lab technicians arrived. The emergency personnel examined Moody and pronounced him dead. Meanwhile, the police officers contacted the Green and White Taxi dispatcher, who told the officers that Moody had responded earlier that morning to a call requesting a pick up at apartment 101 at the 3911 building of the Brookhaven complex.[3] The call was placed at 3:10 a.m. from an Omaha, Nebraska, cell phone number, and the caller had given the name "David."

The officers investigating the crime scene learned that Moody's meter began to run at 3:24 a.m., indicating either that Moody arrived at the 3911 building at 3:24 a.m. or that the unknown passenger(s) got into the cab at that time. The officers then went to apartment 101 of the 3911 building to inquire about the pick-up request. After speaking to the family that lived in apartment 101, the officers determined that the family had not called for the cab.

Around 6:00 a.m., the Hennepin County Medical Examiner, Dr. Andrew Baker, arrived at the crime scene. Dr. Baker began to examine Moody's body. In the course of Dr. Baker's examination, a bullet "fell out" of Moody's body. Dr. Baker later concluded that Moody had suffered three gunshot wounds and died of multiple gunshot wounds.

Around 6:30 a.m., lead Detective Garett Flesland arrived at the crime scene. Flesland and his officers began to canvas the Brookhaven apartments in an effort to locate an eyewitness to the shooting. While the officers did not locate any eyewitnesses, they did speak with D.L., a tenant of the 3911 building. D.L. told the officers

1. The Brookhaven apartment complex is located near the intersection of Brooklyn Boulevard and 65th Avenue North, and consists of three buildings with separate street numbers: 3907, 3909, and 3911–65th Avenue North.

2. The Rainbow Taxi cab driver later recalled that the driver's-side front door and both back-seat doors of the cab were open when he

and his passenger arrived. But he could not recall whether the passenger-side front door was open at the time.

3. Lead Detective Garett Flesland later testified that the caller had actually requested a pick up at 3611–65th Avenue North, an address that does not exist.

that she had heard three gunshots "in quick succession" and had seen a cab parked outside the building. She also told officers that she had seen an airport taxi minivan outside at the same time she noticed the cab. Officers later determined that the airport minivan was not involved in Moody's shooting.

Later that same day, around 3:00 p.m., D.L. called Detective Flesland. D.L. told Flesland that he should speak to Shemica Thomas, a friend of D.L.'s who lived in the 3909 building. D.L. said that Thomas had visitors from Omaha who had arrived Friday, but that the visitors had left Thomas's apartment earlier that morning to go to a Walgreens drug store near the Brookhaven apartment complex. D.L. told Flesland that Thomas had said "she hoped it was gone" when her visitors left, which D.L. interpreted to mean that Thomas hoped the visitors had taken a gun with them.

After ending the telephone call with D.L., Flesland went to D.L.'s apartment. Upon his arrival at the apartment, Flesland learned that Thomas was sleeping in the back bedroom of the apartment. After Thomas awoke, she agreed to speak to Flesland in his squad car and eventually to accompany him to the police department for further conversation about the shooting.

During this conversation, Thomas initially denied having guests at her apartment, but later admitted that she had hosted guests from Omaha. Thomas told Flesland that her guests were named "Brooks" and "Little Will" or "Will." Thomas said that on the previous evening she and her guests had spent time at the Brunswick Zone bowling alley, then took a cab to her apartment where they watched movies, ate pizza, and eventually went to sleep.

Thomas said she and her guests woke up early in the morning to flashing police car lights. She also said that she heard police officers knock on her door later that morning, but her guests told her not to answer the door. Thomas said that sometime after the police had gone, D.L. stopped by Thomas's apartment. Thomas and her guests spoke with D.L. for a few minutes. Then Thomas's guests left for the Walgreens drug store and did not return.[4]

After receiving this information, Flesland obtained a copy of a surveillance video from the Brunswick Zone and asked Thomas if she could identify anyone in the video. Thomas identified both Brooks and Little Will. Flesland then asked Thomas for consent to take possession of any items Brooks left behind in her apartment. Thomas agreed and accompanied Flesland and several police officers to her apartment.

At her apartment, Thomas identified for Flesland a duffel bag and some clothing that belonged to Brooks. Flesland also found two cell phones at Thomas's apartment, one of which was serviced by a cell phone provider in Omaha. The officers later discovered that this cell phone belonged to defendant Brandon Dominic Cox. Flesland and the police officers also searched Thomas's kitchen. While searching the kitchen, Flesland found a handgun and a "baggie" of ammunition in a cupboard above the refrigerator. Flesland then "froze" the apartment and applied to the district court for a search warrant. Upon obtaining the search warrant, Flesland seized the gun and ammunition. Flesland also obtained Thomas's consent to swab her hands for gun residue.

After completing his search of Thomas's apartment, Flesland asked Thomas to re-

---

**4.** Subsequently, police officers searched through dumpsters near the Brookhaven complex, Walgreens, and a nearby elementary school for evidence, but did not find any.

turn to the police department with him. Thomas agreed. At the police department, Thomas told Flesland that she had lied to him earlier, and that one of the people who had visited her was named Brandon Cox, not Brooks. Thomas told Flesland she had known Cox for several years. Thomas also told Flesland that her second visitor was Cox's brother, Little Will, and that Little Will lived in or around Blaine, Minnesota. Thomas then identified Cox in a photograph.

In the meantime, police officers were uncovering information about the cell phone used to call Green and White Taxi. They discovered that the cell phone was registered by Sprint Nextel to a person named L.G., but that L.G. had no knowledge of the cell phone. The officers also learned that the subscriber's address matched Cox's address in Omaha. Finally, the officers learned that the same cell phone had been used to call Blue and White Taxi at 12:25 a.m. on February 4—just a few hours before it was used to call Green and White Taxi—to request a pick up from the Brunswick Zone. The caller had used the name "David."

The police officers also learned that a Blue and White Taxi cab driver named L.T. had responded to the 12:25 a.m. call. L.T. later testified that he picked up two men and a woman from the Brunswick Zone and dropped them off at the 3911 building. L.T. testified that he knew the woman as Shemica Thomas, but did not know either of the men. L.T. testified that he often gave Thomas rides to and from the 3911 building, and believed that she lived in that building.[5] L.T. also testified that after he picked up Thomas and the two men at the Brunswick Zone, he asked for payment up front and the two

men in the cab became angry at the request. L.T. testified that Thomas paid the cab fare.

At the end of the day on February 4, Flesland issued a "probable cause pick up and hold" for Cox. Two days later, Flesland told his assisting detectives to visit an address in Brooklyn Park where he believed a relative of Cox lived. Upon arrival at this address, the detectives knocked on the door. The man who answered the door identified himself as Cox's father. He also told the detectives that he was the father of Willen McIntyre, who goes by the name Little Will. The man then gave the detectives McIntyre's phone number and address. During this conversation, the detectives asked to step into the foyer several different times, but were not permitted to go inside.

Flesland then issued a "probable cause pick up and hold" for McIntyre. Shortly thereafter, police officers arrested McIntyre near his home in Blaine. The officers also traced the gun found in Thomas's apartment to McIntyre's stepfather, in whose name the gun was registered. At the same time, other police officers were conducting surveillance on Cox's father's home and, after learning that Cox was indeed at the home, the officers located and arrested Cox.

Following his arrest, Cox gave a statement to Flesland. Cox told Flesland that his only telephones were a home telephone in Omaha and an Omaha cell phone. Cox explained that he and a friend had travelled from Omaha to Minneapolis the previous Friday afternoon, February 2. Upon arriving in Minneapolis, they went to a downtown hotel and then to a party at another location. At some point, Cox's

---

5. Thomas later told police that she often told L.T. to pick her up at the 3911 building instead of the 3909 building where she lived, because she did not want L.T. to know her real address.

brother McIntyre joined them. Afterward, Cox and his friend got into an argument, and McIntyre's girlfriend gave Cox a ride to Thomas's apartment, where Cox spent the night. Cox told Flesland that on Saturday, February 3, he and Thomas slept in and then spent most of the day at Thomas's apartment. In the afternoon, McIntyre and his girlfriend visited Thomas's apartment. Later, Cox's father joined the group at Thomas's apartment and invited them all to dinner at his home.

Cox told Flesland that after the group had eaten dinner at his father's home, Cox and Thomas went back to her apartment, and then took a cab from her apartment to the Brunswick Zone. McIntyre later met Cox and Thomas at the Brunswick Zone, and the three eventually took a cab back to Thomas's apartment. Back at Thomas's apartment, they borrowed a television and a VCR or DVD player, watched a movie, and went to sleep. Cox told Flesland that he woke up to flashing lights outside the window, and that eventually there was a knock at the door that he believed to be police officers. Cox told Thomas not to answer the door. Sometime later, D.L. came by the apartment and the group talked. Then Cox and McIntyre left Thomas's apartment and walked to the Walgreens drug store, where McIntyre's girlfriend picked them up.

The day after Cox's arrest, Flesland arrested Thomas for aiding an offender. Flesland testified that he believed Thomas had more information about the shooting than she had told him. Additionally, Flesland had been unable to locate Thomas for the previous two days, and stated that he arrested Thomas so that he could hold her in custody at the police department for further questioning about the shooting. After arresting and booking Thomas, Flesland received information that someone claiming to be Thomas's uncle had called

the police department and wanted to speak to Thomas. Flesland allowed Thomas to speak with her uncle on the telephone.

Following the conversation with her uncle, Thomas asked to speak with Flesland alone. Flesland agreed to meet with her. At this meeting, Thomas began to cry and told Flesland that she had lied to him. Thomas told Flesland that on the night of the shooting, she had gone to sleep after watching a movie. Thomas said that instead of sleeping through the night until being awakened by flashing police lights, she actually woke to Cox and McIntyre "slamming the door and asking" if she had "heard anything or heard any gunshots." Thomas said that Cox and McIntyre continued to talk to one another, and Cox said, "[H]e was going to give me the money and then he tried to grab my gun," so "I shot him twice." McIntyre responded that he had also "shot him once." Then Cox looked out the window at the Green and White Taxi cab and said, "I think he must be dead" or "I think he might be dead." Thomas told Flesland that they all tried to go to sleep at that point, but Cox got up in the middle of the night, threw up in the bathroom, and then lay down next to her and apologized at least twice.

Thomas told Flesland that the next morning Cox and McIntyre put on gloves and unloaded their guns in her kitchen. Sometime after they were finished unloading their guns, D.L. arrived at the apartment. Cox and McIntyre asked D.L. questions about the police's actions and whereabouts. Then Cox told McIntyre to go to the Walgreens drug store nearby and that Cox would meet him there. Before Cox left, he asked Thomas for $20, which she gave him. Thomas told the police that she did not hear from Cox or McIntyre again.

Shortly after arresting Cox, the State charged him with second-degree murder

and aiding and abetting intentional murder. On February 22, 2007, a Hennepin County grand jury indicted Cox on charges of (1) first-degree felony murder under Minn.Stat. § 609.185(a)(3) (2010) and Minn.Stat. § 609.05 (2010); (2) second-degree intentional murder under Minn.Stat. § 609.19, subd. 1(1) (2010) and Minn.Stat. § 609.05; and (3) being a prohibited person in possession of a firearm under Minn.Stat. § 624.713, subds. 1(2), 2(b) (2010). A jury trial began on November 5, 2007. The jury found Cox guilty on all counts, and the district court convicted Cox and sentenced him on November 29, 2007, on the first-degree murder count and possession of a firearm count. On direct appeal, we reversed Cox's convictions on Confrontation Clause grounds and remanded for a new trial. *State v. Cox,* 779 N.W.2d 844, 852–53 (Minn.2010).

Cox's second trial—the trial at issue in this appeal—began on October 22, 2010. During the second trial, Thomas testified for the State, as did several other witnesses. At the close of trial, the district court denied a request by Cox to instruct the jury on accomplice testimony as to Thomas. The jury began deliberating on October 28 at about 4:30 p.m. At 11:46 a.m. on October 29, the jury found Cox guilty of possession of a firearm. At 1:09 p.m., the jury found Cox guilty of second-degree intentional murder. At 3:31 p.m., the jury foreperson sent a note to the court stating that the jury had reached a verdict on two charges but had not reached a verdict on the third charge. At 4:15 p.m., the court instructed the jury to continue deliberating to see if a verdict could be reached. At 4:45 p.m., the jury found Cox guilty of first-degree felony murder.

The district court convicted Cox of first-degree felony murder, second-degree intentional murder, and being a prohibited person in possession of a firearm. The court then sentenced Cox to life in prison with the possibility of release after 360 months on the first-degree felony murder conviction. The court also sentenced Cox to a concurrent 60–month sentence on the prohibited person in possession of a firearm conviction. Even though the court convicted Cox of second-degree intentional murder, the court did not sentence Cox on that conviction, stating: "Although you stand separately convicted of that count, the sentence on the first count covers the second conviction as well because the second conviction on murder in the second degree merges into the conviction for murder in the first degree." Cox directly appealed to our court.

On appeal, Cox raises the following three arguments: (1) the court erred by failing to instruct the jury that it could not find Cox guilty on Thomas's uncorroborated accomplice testimony, (2) the court erred by instructing the jury to continue deliberating after the jury indicated it was deadlocked, and (3) the court erred by convicting him of both first- and second-degree murder.

I.

We first consider whether the district court erred when it declined Cox's request for a jury instruction on accomplice testimony. We will not reverse a district court's decision to decline giving a requested jury instruction absent an abuse of discretion. *State v. Palubicki,* 700 N.W.2d 476, 487 (Minn.2005). We review the court's decision not to give a requested accomplice testimony instruction under our harmless-error test. *State v. Jackson,* 746 N.W.2d 894, 898 (Minn.2008). Under our harmless-error test, we determine first whether the court erred, and if so, whether that error was harmless beyond a reasonable doubt. *State v. Lee,* 683 N.W.2d 309,

316 (Minn.2004); *State v. Shoop*, 441 N.W.2d 475, 480–81 (Minn.1989).

■ District courts must instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider that a witness testifying against the defendant is an accomplice. *State v. Barrientos–Quintana*, 787 N.W.2d 603, 610 (Minn. 2010) (quoting *State v. Strommen*, 648 N.W.2d 681, 689 (Minn.2002)); *see* Minn. Stat. § 634.04 (2010) (prohibiting convictions based on uncorroborated accomplice testimony). This duty arises from the " 'very real possibility' " that a jury might discredit all testimony except the accomplice testimony, and thus find the defendant guilty on the accomplice testimony alone. *Barrientos–Quintana*, 787 N.W.2d at 610 (quoting *Strommen*, 648 N.W.2d at 689). We have explained that courts distrust accomplice testimony because the accomplice might have chosen to testify against the defendant " 'in the hope of or upon a promise of immunity or clemency or to satisfy other self-serving or malicious motives.' " *State v. Clark*, 755 N.W.2d 241, 251 (Minn.2008) (quoting *Shoop*, 441 N.W.2d at 479). An accurate accomplice testimony instruction responds to this concern by stating that the jury " 'cannot find the defendant guilty of a crime on the testimony of a person who could be charged with that crime, unless that testimony is corroborated by other evidence that tends to convict the defendant of the crime.' " *Barrientos–Quintana*, 787 N.W.2d at 610 (quoting 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instructions Guides, Criminal*, CRIMJIG 3.18 (5th ed.2006)).

■ To determine whether an accomplice testimony instruction is necessary, we consider whether the alleged accomplice/witness could have been "indicted and convicted" of the same crime for which the defendant is charged. *Palubicki*, 700 N.W.2d at 487. If there is a question whether a witness is an accomplice, the jury should make the determination. *Id.* But if the facts of the case are undisputed and there is only one inference that can be drawn as to whether a witness is an accomplice, the court should decide whether the witness is an accomplice. *Jackson*, 746 N.W.2d at 898.

Here, the district court concluded that the evidence presented at trial did not support Cox's assertion that Thomas could have been indicted and convicted of the same crime as Cox. Accordingly, the court concluded that Thomas was not an accomplice and the court did not submit the accomplice question to the jury. The court then declined to give an accomplice testimony instruction because the instruction was unnecessary. Thus, to determine whether the district court abused its discretion when it declined to give an accomplice testimony instruction, we must determine (1) whether the district court erred when it declined to give an accomplice testimony instruction, and if so, (2) whether that error was harmless beyond a reasonable doubt. *Jackson*, 746 N.W.2d at 898–99.

Here, the district court erred if the evidence presented at Cox's trial was sufficient to support a conclusion by the court that Thomas was an accomplice—or, at minimum, to present a question for the jury. *See Shoop*, 441 N.W.2d at 479; *see also Barrientos–Quintana*, 787 N.W.2d at 612 (concluding under a plain error analysis that the district court erred by declining an accomplice testimony instruction). As we have noted, Thomas is an accomplice if she could have been indicted and convicted for the crime with which Cox was charged—the shooting of Moody. *Jackson*, 746 N.W.2d at 898 (quoting *State v. Lee*, 683 N.W.2d 309, 314 (Minn.2004)); *see* Minn.Stat. § 634.04. Thomas could be

indicted and convicted for the shooting of Moody if Thomas aided and abetted Cox. Minn.Stat. § 609.05, subd. 1 (2010).

We have said that a person aids and abets another when that person plays a "knowing role in the commission of the crime" and "takes no steps to thwart its completion." *State v. Ostrem*, 535 N.W.2d 916, 924 (Minn.1995) (citation omitted) (internal quotation marks omitted). A person plays a "knowing role in the crime" if the person has more than a "mere presence at the scene, inaction, knowledge and passive acquiescence." *Palubicki*, 700 N.W.2d at 487 (citation omitted) (internal quotation marks omitted). When determining whether a person played a knowing role in the commission of the crime, we may infer criminal intent from the person's presence, companionship, and conduct both before and after the crime. *Id.*

Cox argues that the following facts support his assertion that Thomas was an accomplice: Thomas was with Cox and McIntyre immediately before and after the shooting, frequently called cabs to the 3911 building even though she did not live there, had used the Omaha cell phone to make calls that weekend because her own phone had been shut off, had little to no money, and lied to the police following the shooting. We conclude that Cox's assertion that Thomas was an accomplice is without merit. More specifically, we conclude that there was no clear evidence presented at trial that Thomas played a knowing role in the shooting of Moody. *See id.* Thus, we conclude that the facts listed by Cox are insufficient to support the assertion that Thomas was an accomplice in Moody's shooting because the facts do not indicate that Thomas could have been indicted and convicted of Moody's shooting.[6] Our case law supports this conclusion.

For example, in *State v. Ulvinen*, we concluded that the defendant's mother was not an accomplice—even though she knew her son intended to kill his wife, awoke shortly after her son choked his wife to death nearby, kept watch while her son dismembered his wife's body, cleaned bloody items when the son finished dismembering his wife's body, and corroborated her son's false story to the police. 313 N.W.2d 425, 428 (Minn.1981). Instead, we concluded in *Ulvinen* that the defendant's mother had "passively acquiesced" to the crime, but had not encouraged her son to act. *Id.* We explained that aiding and abetting requires something beyond passive acquiescence, and "implies a high level of activity on the part of an aider and abettor in the form of conduct that encourages another to act." *Id.; see also* Minn. Stat. § 609.05.

In contrast, we concluded in *State v. Merrill* that there was sufficient evidence to conclude that the defendant was an accomplice to a murder. 428 N.W.2d 361, 368 (Minn.1988). In *Merrill*, the defendant/accomplice and two friends spent the night at the victim's home. *Id.* at 364. The next morning, the defendant/accomplice returned to the victim's home with his friends—perhaps with the intent to kill the victim. Upon returning to the victim's home, the defendant/accomplice stole items from the victim, purposefully injured the victim, removed evidence of his presence

---

6. Cox also argues that testimony at trial that all four doors of the cab's doors were open could lead the jury to conclude that a fourth person was present at the shooting—Thomas. We disagree. First, the witness testifying about the doors stated that he could not remember how many doors were open. Second, even if Thomas was present at the scene of the shooting, mere presence is insufficient to conclude that she was an accomplice. *See Ostrem*, 535 N.W.2d at 924–25.

at the victim's home, and fled the state after one of the friends stabbed and killed the victim. *Id.* at 368. In concluding that the defendant was an accomplice, we emphasized that unlike in *Ulvinen,* the defendant's criminal actions in *Merrill* occurred *before* the murder, not after. *Id.* at 367; *see also Ostrem,* 535 N.W.2d at 925 (distinguishing *Ulvinen* and *Merrill* ).

The cases above indicate that Thomas's involvement in this case falls short of the type of involvement necessary for us to conclude that a person is an accomplice. There was no evidence presented at trial that Thomas knew that Cox and McIntyre planned to shoot or even rob Moody. *See State v. Flournoy,* 535 N.W.2d 354, 360 (Minn.1995). There was no evidence that Thomas was present during the shooting, or that she participated in the shooting. *See Palubicki,* 700 N.W.2d at 488. There was no evidence that Thomas encouraged the shooting. *See Ulvinen,* 313 N.W.2d at 428–29. In short, there was no evidence that Thomas played a "knowing role" in the shooting, much less, that Thomas could be indicted and convicted for the same crime as Cox. *Palubicki,* 700 N.W.2d at 487 (citation omitted) (internal quotation marks omitted). Further, to the extent that Thomas may be liable as an accessory after the fact due to her initial efforts to mislead the police, we have held that an accessory after the fact is not guilty as an accomplice. *State v. Henderson,* 620 N.W.2d 688, 701 (Minn.2001); *see also Palubicki,* 700 N.W.2d at 487.

For the foregoing reasons, we conclude that there was insufficient evidence presented at trial that Thomas was an accomplice. Thus, we conclude that the district court did not err when it declined Cox's request for a jury instruction on accomplice testimony. Therefore, we hold that the district court did not abuse its discretion when it concluded that Thomas was

not an accomplice and did not submit the question to the jury or offer an accomplice testimony instruction.

**II.**

■■■■ We next turn to Cox's argument that the district court erred when it instructed the jury to continue deliberating after the court received a note that the jury was "deadlocked." We have said that we give district courts "considerable latitude in the selection of the language of the jury charge." *State v. Jones,* 556 N.W.2d 903, 910 (Minn.1996) (citation omitted) (internal quotation marks omitted). Nevertheless, it is reversible error to "coerce" a jury toward a unanimous verdict. *Id.* at 912. We apply our abuse of discretion standard when reviewing a district court's charge to a jury to continue deliberating after the jury has indicated it was deadlocked. *State v. Buggs,* 581 N.W.2d 329, 338–39 (Minn.1998); *State v. Kelley,* 517 N.W.2d 905, 909 (Minn.1994) (citing A.B.A. Standards—Relating to Trial by Jury § 15–4.4(b) (1980)). In undertaking this review, we consider whether the jury instructions as a whole made material misstatements about the law or coerced a jury toward a unanimous verdict. *Jones,* 556 N.W.2d at 910–11. As long as the district court does not coerce a verdict, the court may require the jury to continue deliberating. *Id.* at 912.

We begin our analysis by noting that despite Cox's assertion to the contrary, the jury never indicated that it was deadlocked. The jury's note to the district court stated: "We have agreed on a verdict on two charges, but have not been able to agree on a third charge. What happens if we are unable to agree on the third charge?" Cox argues that this note indicated that the jury was deadlocked, and that the court erred by instructing the deadlocked jury to continue deliberating.

We disagree. The jury's note does not indicate that the jury was deadlocked. By asking, "What happens *if* we are unable to agree on the third charge" (emphasis added), the jury appears to seek guidance not because the jury is currently deadlocked, but in the event that the jury may become deadlocked in the future. Thus, we conclude that the court did not abuse its discretion in instructing the jury to continue deliberating because the jury was never deadlocked.

■ Even if we were to conclude that the jury was deadlocked, we would still conclude that the district court did not abuse its discretion in its communications to the jury after receiving the jury's note. In *State v. Martin*, we adopted the ABA Standards Relating to Trial by Jury as an appropriate instruction to give a deadlocked jury. 297 Minn. 359, 371–72, 211 N.W.2d 765, 771–72 (1973). The ABA Standards are now reflected in CRIMJIG 3.04.[7] *See Jones*, 556 N.W.2d at 911. While CRIMJIG 3.04 is an appropriate instruction, we do not require courts to read a particular instruction to a deadlocked jury. *See id.* Rather, we consider whether the court required the jury to "deliberate for an unreasonable length of time or for unreasonable intervals." *Id.* at 912. We also consider whether the jury "was fully able to discern the limits of its obligations," or whether the jury believed it was required to deliberate until it reached a unanimous verdict on each

count. *Buggs*, 581 N.W.2d at 338; *accord Kelley*, 517 N.W.2d at 909.

Here, the district court instructed the jury on CRIMJIG 3.04 before it began deliberations, stating:

> In order for you to return a verdict, whether guilty or not guilty, each juror must agree with the verdict. Your verdict must be unanimous, and your verdict must be unanimous as to each count charged. You should discuss the case with one another and deliberate with a view toward reaching agreement if you can do so without violating your individual judgment. You should decide the case for yourself but only after you have discussed the case with your fellow jurors and have carefully considered their views. You should not hesitate to reexamine your views and change your opinion if you become convinced they are erroneous. But you should not surrender your honest opinion simply because other jurors disagree or merely to reach a verdict.

Then, after receiving the note from the jury, the court stated:

> At this point, I am going to send you back for further deliberation. At this point, I think that more deliberation is necessary to see if a verdict can be reached on the remaining charge that you have at least, as of now, have been unable to reach a verdict on. So at this point, that is going to be my order to you. You have heard the instructions.

---

7. CRIMJIG 3.04 states:

> In order for you to return a verdict, whether guilty or not guilty, each juror must agree with that verdict. Your verdict must be unanimous.
>
> You should discuss the case with one another, and deliberate with a view toward reaching agreement, if you can do so without violating your individual judgment. You should decide the case for yourself, but only after you have discussed the case with

> your fellow jurors and have carefully considered their views. You should not hesitate to reexamine your views and change your opinion if you become convinced they are erroneous, but you should not surrender your honest opinion simply because other jurors disagree or merely to reach a verdict.
>
> 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instructions Guides, Criminal*, CRIMJIG 3.04 (5th ed.2006).

You have been given a copy of the instructions previously on the deliberation process, and I'm going to you ask [sic] that you continue to work on your deliberations for some additional time at this point.

With that, that is my further instruction to the jury and I think that more deliberation, given the nature of this case, and it's obviously important to all parties involved, that further deliberation occur.

■ Given the language the district court used to instruct the jury, we conclude that the court did not coerce the jury to reach a verdict. First, the court instructed the jury on CRIMJIG 3.04 before deliberations. *See Jones,* 556 N.W.2d at 912. Further, the instruction given to the jury after receiving the jury's note emphasized that the court was requiring the jury to continue deliberations only *"at this point"* to see *"if* a verdict can be reached." It is unlikely that the jury would interpret that instruction to mean that it was required to reach a verdict, especially as the jury was originally instructed not to surrender individually held opinions merely to reach a verdict. *Cf. Kelley,* 517 N.W.2d at 909–10. Moreover, the jury was not required to deliberate for an unreasonable length of time—the jury returned its verdict less than 30 minutes after receiving the second instruction from the court. *See Jones,* 556 N.W.2d at 912. For the foregoing reasons, we hold that the court did not abuse its discretion when it instructed the jury to continue deliberating.

### III.

■ The last issue we address is whether Cox may be lawfully convicted of both first- and second-degree murder. This issue requires us to determine whether second-degree intentional murder is a lesser-included offense of first-degree felony murder. This is a legal question we review de novo. *See Spann v. State,* 740 N.W.2d 570, 573–74 (Minn.2007).

Under Minn.Stat. § 609.04, subd. 1 (2010), a defendant may not be convicted of both the crime charged and an "included offense." Section 609.04, subdivision 1, defines an "included offense" as:

(1) A lesser degree of the same crime; or

(2) An attempt to commit the crime charged; or

(3) An attempt to commit a lesser degree of the same crime; or

(4) A crime necessarily proved if the crime charged were proved; or

(5) A petty misdemeanor necessarily proved if the misdemeanor charge were proved.

We have held that second-degree intentional murder is a lesser-included offense of first-degree felony murder. *Spann,* 740 N.W.2d at 573–74. For example, in *Spann,* the jury returned guilty verdicts for first-degree murder while committing an aggravated robbery, second-degree intentional murder, and first-degree aggravated robbery. *Id.* at 573. We vacated Spann's convictions of intentional second-degree murder and first-degree aggravated robbery because they were lesser-included offenses of first-degree felony murder, even though Spann had received no sentence for those convictions. *Id.* at 574.

Similarly, in this case the jury returned guilty verdicts on counts of first-degree felony murder, second-degree intentional murder, and being a prohibited person in possession of a firearm. The district court then convicted Cox on all three counts but did not sentence Cox on the second-degree intentional murder conviction. Even though the court did not sentence Cox on the second-degree intentional murder conviction, we hold that the court erred by

convicting Cox of the offense because second-degree intentional murder is a lesser-included offense of first-degree felony murder, and thus the conviction violates Minn.Stat. § 609.04, subd. 1. Therefore, we vacate Cox's second-degree intentional murder conviction. But, we note that vacating Cox's second-degree intentional murder conviction does not overturn or reverse the jury's guilty verdict on that count—a jury's verdict is unaffected when a conviction on the verdict is vacated.

Affirmed in part, reversed in part, and vacated in part.