*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0250**

State of Minnesota,
Respondent,

vs.

Bryon Christopher Hultquist,
Appellant.

**Filed December 18, 2023**
**Reversed and remanded**
**Ede, Judge**

Becker County District Court
File No. 03-CR-22-1701

Keith Ellison, Attorney General, Ed Stockmeyer, Assistant Attorney General, St. Paul, Minnesota; and

Brian W. McDonald, Becker County Attorney, Detroit Lakes, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Adam Lozeau, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bjorkman, Presiding Judge; Segal, Chief Judge; and Ede, Judge.

**NONPRECEDENTIAL OPINION**

**EDE**, Judge

In this direct appeal from the final judgment of conviction for one count of attempted second-degree burglary and one count of possession of burglary tools, appellant argues that he is entitled to a new trial because the district court committed reversible error by

instructing the jury to work through an impasse during deliberations. In the alternative, appellant asserts that this court should reverse his possession-of-burglary-tools conviction and remand with instructions to vacate because the district court did not adjudicate appellant guilty of that charge. Based on the specific facts of this case, we conclude that the district court's instructions to the jury during deliberations resulted in reversible error. We therefore reverse and remand for a new trial.

## FACTS

Shortly before 7:00 a.m. on August 25, 2022, a police officer responded to a report of a burglary in progress at a storage building located across the street from a gym. The reporting witness said that she saw a man with a black truck in possession of a crowbar. The police officer located appellant Bryon Christopher Hultquist walking towards a black truck, which belonged to Hultquist. The officer arrested Hultquist and found a crowbar in the truck. Respondent State of Minnesota charged Hultquist with one count of attempted second-degree burglary, in violation of Minnesota Statutes sections 609.583, subdivision 2(a)(4), and 609.17, subdivision 1 (2022), and one count of possession of burglary tools, in violation of Minnesota Statutes section 609.59 (2022). The parties tried the matter to a jury over two days in October 2022.

At trial, the reporting witness testified that, while leaving the gym, she saw a man across the street trying to pry open a door of a nearby building. The witness described the man and his black truck. After the witness made eye contact with the man while he was trying to pry open the door, the man dropped the crowbar and looked away. She got into her car and called 911. On cross-examination, the witness said she saw the man for about

five seconds and that the man did not run away after they made eye contact. On redirect, regarding her testimony about the man attempting to pry the door, the witness demonstrated what she had seen by holding her hands in the air by her forehead and pulling them back and forth. The state also introduced a recording of the phone call the witness made to police, reporting the incident.

The state presented testimony from the responding police officer, who explained that he detained Hultquist and found a crowbar inside Hultquist's truck. According to the officer, the truck was extremely messy with lots of personal property "all over the inside." The officer also stated that, while walking around the area, he found a hose outside a nearby abandoned house that someone had apparently used to siphon gas. The officer saw a similar hose in Hultquist's truck bed. On cross-examination, the officer testified that security footage showed Hultquist digging through a dumpster outside a nearby shop, Design 2 Sell, around 3:30 a.m.; that security footage did not show Hultquist trying to pry open any doors; and that it was bright out when the officer responded to the attempted burglary report. In addition, the officer said that Hultquist did not deny owning the crowbar—but did deny using it to pry the door in question—and that Hultquist offered to let the officer search his truck.

The state further presented testimony from an employee of a nearby shop and the gym owner. The employee stated that the building where the incident occurred was old and used for storage. The employee testified that the subject door had a "bent" clasp or latch with a padlock. He said that, although the bend occurred several years earlier, it appeared

3

more bent after the incident. The gym owner testified that he saw a man walking with a gas can towards a black truck.

In the defense's case, Hultquist testified that he is a "jack of all trades," including carpentry, landscaping, and other odd jobs, and that he gets materials for repairs from dumpsters. Hultquist explained that he keeps a lot of tools in his truck, including multiple prybars to pry apart boards that he finds for salvage. Around 3:00 a.m. on the day of the incident, he started searching a dumpster behind the Design 2 Sell. Hultquist then fell asleep in his truck, which was parked near the gym. He left the gym after he saw people around. While driving around, Hultquist ran out of gas. He called a friend, who met him a few blocks away and allowed him to siphon gas into a can.

Hultquist testified that he returned to his truck and drove over to the storage building. He looked for a phone number or sign saying who owned the building because he was interested in salvaging floor planks that he had found in an adjacent dumpster. He said he looked around but did not find any information. He denied prying the door in question or trying to get into the building. In addition, Hultquist presented testimony from a defense investigator who stated that there was another door to the building that was boarded over, and that door would have been more easily accessible via crowbar. The investigator also testified that the scratch marks on the door did not appear to be caused by a crowbar.

Following the close of evidence on the second day of trial, the district court instructed the jury on the applicable law, including as follows:

4

In order for you to return a verdict, whether guilty or not guilty, each juror must agree with that verdict. Your verdict must be unanimous.

You should discuss this case with one another and deliberate with the view to reaching an agreement if you can do so without violence to your individual judgment. You should decide the case for yourself, but only after you have discussed the case with your fellow jurors, and you have carefully considered their views. You should not hesitate to reexamine your view and change your opinion if you become convinced it is erroneous, but you should not surrender your honest opinion simply because the jurors disagree or merely in order to reach a verdict.

This was a near-verbatim recitation of a former model jury instruction, "CRIMJIG 3.04," which has since been renumbered as 3.02. *Compare* 10 *Minn. Prac.*, CRIMJIG 3.04 (6th ed. 2022), *with* 10 *Minn. Prac.*, CRIMJIG 3.02 (7th ed. 2023).

Jury instructions concluded at 10:20 a.m. and deliberations began around midday. During deliberations, the jury requested to relisten to the reporting witness's recorded call and her description of the prying movements she had observed. The district court replayed the call for the jury and sent it a written note, asking for clarification of the jury's other request.

After continued deliberations, the jury sent a second note to the district court stating: "We are at this point not able to reach a unanimous decision. What's next?" The court, defense counsel, and the prosecutor discussed the matter on the record. The district court proposed the following response to the parties: "You're instructed to attempt to work through your impasse and continue in your deliberations. You should keep in mind my previous instructions." Both defense counsel and the prosecutor agreed with the court's

proposed response. But the district court's actual response, which it provided in a second written note to the jury that was delivered outside the presence of the parties, instead stated: "You are instructed to work through your impasse. In continuing your deliberations, you must keep in mind my previous instructions." The record does not reflect the timing of this exchange, i.e., how long the jury had deliberated prior to submitting its second note or when the district court responded.

The jury submitted a third note, written at 4:50 p.m., which stated: "We have 11 jurors who agree – one juror who does not[.] This juror[,] we feel[,] is not following the judge[']s instructions." The district court, defense counsel, and the prosecutor again discussed the matter on the record. The court proposed the following response, and the defense and prosecution agreed: "You are all required to follow my Jury Instructions. Continue to deliberate under the direction of the Jury Instructions with a goal towards reaching a verdict." The district court stapled the foregoing written response to the jury's third note and provided it to the jury.

The jury found Hultquist guilty of both charges. The district court filed the jury's guilty verdicts at 5:28 p.m. At the sentencing hearing, the district court adjudicated Hultquist guilty of attempted burglary and imposed a sentence of 12 months and 1 day, which the court stayed for five years. During the hearing, the district court initially pronounced that it was adjudicating Hultquist on the possession-of-burglary-tools count, but then later clarified that the charge remained unadjudicated.

Hultquist appeals.

6

**DECISION**

Hultquist argues that he is entitled to a new trial because the district court's instructions to the jury during deliberations constituted reversible error. In the alternative, he contends that this court should reverse his possession-of-burglary-tools conviction and remand for the district court to vacate the adjudication of that charge as erroneously entered. Because we conclude that Hultquist is entitled to a new trial, we do not reach his alternative claim of error.

Hultquist asserts that the district court committed reversible error by coercing the jury into reaching a decision. In particular, Hultquist points to the court's written instruction that the jury "work through [its] impasse" in response to the jury's note stating that it was "at this point not able to reach a unanimous decision."

As an initial matter, we are unpersuaded by the state's argument that Hultquist forfeited this challenge and that our review is governed by the plain-error doctrine. The forfeiture doctrine generally precludes a party from obtaining appellate relief when the party fails to object to jury instructions before the district court, unless the plain-error standard is satisfied. *See, e.g.*, *State v. Beganovic*, 991 N.W.2d 638, 655 (Minn. 2023). This doctrine "encourages defendants to object while before the district court so that any errors can be corrected before their full impact is realized." *Id.* (quotation omitted). But the forfeiture doctrine is inapplicable here. Hultquist did not have the opportunity to object to the district court's instruction because, after orally proposing one response that was acceptable to the parties, the court omitted the words "to attempt" from the written response that the court provided to the jury. As a result, rather than instructing the jury "to attempt

to work through [its] impasse," the district court instructed the jury "to work through [its] impasse," and neither Hultquist nor the prosecutor were aware of the omission until after the jury returned its verdict. Accordingly, Hultquist has not forfeited his challenge to the district court's instructions, and we now address the merits of his claim.[1]

We apply the "abuse of discretion standard when reviewing a district court's charge to a jury to continue deliberating after the jury has indicated it was deadlocked." *State v. Cox*, 820 N.W.2d 540, 550 (Minn. 2012). Although district courts have "considerable latitude" in instructing the jury, it is reversible error to coerce a jury into reaching a unanimous verdict. *Id*. "A court, therefore, can neither inform a jury that a case must be decided, nor allow the jury to believe that a 'deadlock' is not an available option." *State v. Jones*, 556 N.W.2d 903, 912 (Minn. 1996) (citing *State v. Martin*, 211 N.W.2d 765, 772-73 (Minn. 1973) and *State v. Kelley*, 517 N.W.2d 905, 909-10 (Minn. 1994)). "As long as the district court does not coerce a verdict, the court may require the jury to continue deliberating." *Cox*, 820 N.W.2d at 550.

To determine whether the district court's communications were coercive, *Cox* identified two considerations: (1) "whether the court required the jury to deliberate for an unreasonable length of time or for unreasonable intervals"; and (2) "whether the jury was fully able to discern the limits of its obligations," or instead "believed it was required to deliberate until it reached a unanimous verdict on each count." *Id.* at 551 (quotations

---

[1] For the same reasons, the "invited-error doctrine" does not apply. *See Pulczinski v. State*, 972 N.W.2d 347, 360 n.10 (Minn. 2022) (discussing the history and contours of the "invited-error doctrine").

omitted). "[T]elling a jury that it must reach a verdict may cause jurors holding a minority viewpoint to surrender their honest beliefs in order to reach a unanimous verdict" and "is particularly coercive when delivered to a jury that is at an impasse." *State v. Olsen*, 824 N.W.2d 334, 338 (Minn. App. 2012), *rev. denied* (Minn. Feb. 27, 2013). "If a trial court's instructions appear to have coerced a jury to reach a unanimous verdict, or allowed the jury to believe that a deadlock is not a possible outcome to their deliberations, a new trial is necessary." *Jones*, 556 N.W.2d at 910-11 (citations omitted). We begin by considering whether the jury communicated that it was deadlocked before turning to our analysis of the district court's responsive instructions.

First, Hultquist and the state dispute whether the jury conveyed that it was at an impasse. Based on the language the jury used, we agree with Hultquist.

The jury's second note stated: "We are at this point not able to reach a unanimous decision. What's next?" By stating that it was "not able to reach a unanimous decision" "at this point," the jury communicated that it had reached an impasse.[2] The district court—having heard the trial evidence and having interacted with the jury throughout the proceedings—itself used the phrase, "your impasse," in its response to the jury.

_____

[2] Our focus here is on the words the jury included in its message to the district court, not how long the jury had deliberated (i.e., less than five hours) when it submitted the second note to the court. In *Olsen*, we rejected an argument by the state similar to the position the state advances here, that the jury was "not coerced by the district court's instruction" where the jury had "deliberated for less than five hours." 824 N.W.2d at 339-40 n.2. Citing a precedential decision in which "the district court committed reversible error by delivering a coercive instruction after only six hours of deliberations," as well as published cases in which "the coercive instruction was given eight hours into deliberations," we reasoned that "we have never held that delivering a coercive instruction is not reversible error simply because the jury is not far into its deliberations." *Id.* (citations omitted).

The state's reliance on *Cox* is unavailing. In *Cox*, the jury's note stated, "We have agreed on a verdict on two charges, but have not been able to agree on a third charge. *What happens if we are unable to agree on the third charge?*" 820 N.W.2d at 550 (emphasis added). Construing the language used by the jury in its note, the supreme court explained that "the jury appear[ed] to seek guidance not because the jury is currently deadlocked, but in the event that the jury may become deadlocked in the future." *Id.* at 551. By contrast, the jury here told the court in its note that, "at this point," it was "not able to reach a unanimous decision." Accordingly, *Cox* is inapposite to the specific record before us, where the jury conveyed that it was at an impasse.

Second, we analyze the district court's instructions. Hultquist argues that, by instructing the jury to "work through [its] impasse[,]" the court allowed the jury to believe that deadlock was not a permissible outcome, and thus the jury could not discern the limits of its obligations. The state responds that the district court's instructions, when considered as a whole, permissibly required the jury to continue deliberations. Although we conclude that the district court did not require the jury to deliberate for an unreasonable length of time or for unreasonable intervals, we agree with Hultquist that, under the second consideration described in *Cox*, the court's instructions were impermissibly coercive. 820 N.W.2d at 550.

More specifically, the district court responded to the jury's stated inability to reach a unanimous decision by instructing the jury to "work through [its] impasse." This left the jury unable "to discern the limits of its obligations." *See Cox*, 820 N.W.2d at 551. The court's instruction that the jury affirmatively "work through"—rather than "attempt to

10

work through," which the parties had agreed was appropriate—was coercive, particularly after the jury had reached, as the district court put it, an "impasse." In other words, the instruction suggested that a deadlock was not a permissible outcome.

The state argues that this charge to the jury was not coercive when considered in the full context of the district court's other instructions. As support, the state relies on the district court's nearly verbatim reading of the former CRIMJIG 3.04, which specified that jurors "should not surrender [their] honest opinion simply because [they] disagree or merely in order to reach a verdict." But neither the supreme court nor this court have held that reading an instruction like the former CRIMJIG 3.04 during the initial jury charge necessarily renders any later communication non-coercive. Rather, the supreme court has highlighted "the ameliorative effect of giving the proper charge, CRIMJIG 3.04, *when the jury reached a deadlock*," but has "emphasized that to do so is not a panacea." *Jones*, 556 N.W.2d at 911 (emphasis added); *see also Olsen*, 824 N.W.2d 336-37, 340 (concluding that the district court's instruction to reach a decision was coercive even where the initial charge included the former CRIMJIG 3.04).

Likewise, the state's reliance on *State v. Buggs*, 581 N.W.2d 329 (Minn. 1997),[3] is misplaced. In *Buggs*, the supreme court held that "the trial court did not abuse its discretion in charging the jury," reasoning that the trial court's notes telling the jury to "'try to resolve these issues yourselves, if you can do so' and 'continue to try to work through your impasse' would not lead the jury to conclude they were required to deliberate until a

---

[3] The supreme court overruled *Buggs* on grounds unrelated to its analysis of alleged instructional error. *See State v. McCoy*, 682 N.W.2d 153, 160 n.6 (Minn. 2004).

unanimous verdict was reached." 581 N.W.2d at 338-39. The supreme court concluded that "the jury was fully able to discern the limits of its obligations and was not coerced to reach a verdict" because, among other things, the "nature of the trial court's notes" was "noncoercive" and "the defense was fully advised of the notes." *Id.* at 338. By contrast, the district court's second note in this case *was* coercive because it directed the jury "to work through [its] impasse"—not to try to resolve the issues if it could do so, or to attempt to work through its impasse—and the defense was *not* fully advised of the court's written note, which differed from the proposal that the district court had discussed with the parties.

Our decision in *Olsen* is more on point. There, the district court read the former CRIMJIG 3.04 during its initial charge. 824 N.W.2d at 336-37. After nearly five hours of deliberations, the jury sent a note stating, "We have reached an impasse, how should we continue." *Id.* at 337. We explained that the supreme court's decisions in *Martin* and *Jones* "stand for the proposition that, if the district court's instructions, taken as a whole, communicate to a jury at an impasse either that it must reach a verdict, or that deadlock is not an option, the district court has committed reversible error." *Id.* at 339. We concluded that the district court's response—specifically its statement, "[t]here are twelve of you and you are to make a decision on this"—communicated to the jury that it must reach a verdict. *Id.* As a result, we held that the instruction to "make a decision," communicated to a jury reporting an impasse and considered in the context of the jury instructions as a whole, "constituted the reversible error of coercing the jury to reach a verdict." *Id.* Although the jury here was not affirmatively told that it must "make a decision," the district court's charge that the jury "work through [its] impasse" communicated that a deadlock was not a

12

permissible outcome and that the jury should instead reach a verdict. *See Jones*, 556 N.W.2d at 912 (explaining that, because "it is reversible error in Minnesota to coerce a jury towards a unanimous verdict," a district court "can neither inform a jury that a case must be decided nor allow the jury to believe that a 'deadlock' is not an available option" (citations omitted)).

Our conclusion that the district court's instructions, as a whole, led the jury to believe it must reach a unanimous verdict is reinforced by the subsequent communications between the jury and the district court. The jury sent a note at 4:50 p.m. stating: "We have 11 jurors who agree – one juror who does not[.] This juror[,] we feel[,] is not following the judge[']s instructions." The district court responded, "You are all required to follow my Jury Instructions. Continue to deliberate under the direction of the Jury Instructions with a goal towards reaching a verdict." The jury's guilty verdicts were then filed at 5:28 p.m.

The instruction above was not coercive on its face. But the jury's third note stated that the lone holdout was not following the judge's instructions, and the district court had instructed the jury to "work through [its] impasse." Given that background, the district court's directive that the jury continue deliberating—again without explaining that the jury needed only to "attempt to work through [its] impasse," while underscoring the jury's goal as reaching a verdict—did not sufficiently advise the jury about its obligations. Instead, the court's response allowed the jury to believe that a deadlock was impermissible. *See Kelley*, 517 N.W.2d at 909 (concluding that, "while the court's communications were not coercive on their face, they did not provide the careful description of the obligations of the jurors, individually and collectively, which the *Martin* court approved").

13

In sum, our analysis rests on the context of the district court's jury instructions as a whole and the specific facts of this case. We conclude that the court's instruction to the jury to "work through [its] impasse," in response to the jury's communication that it was not able to reach a unanimous decision at that point, constituted an abuse of discretion. This reversible error entitles Hultquist to a new trial.

**Reversed and remanded.**